183 Cal.App.4th 1250 (2010)
In re ADAM D. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent,
v.
MARLA D. et al., Defendants and Appellants.
No. B219898.
Court of Appeals of California, Second District, Division Three.
March 30, 2010.
As modified April 15, 2010.
*1252 Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant Marla D.
Eva E. Chick, under appointment by the Court of Appeal, for Defendant and Appellant Dorian D.
James M. Owens, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

OPINION
KLEIN, P. J.
Marla D. (mother) and Dorian D. (father) appeal an order for informal supervision entered under Welfare and Institutions Code section 360, subdivision (b).[1] Mother and father contend the evidence is insufficient to support the finding their child was neglected within the meaning of section 300, subdivision (b), the juvenile court's jurisdictional finding resulted in a *1253 miscarriage of justice and the issues raised are not moot. The Los Angeles County Department of Children and Family Services contends the juvenile court's "dismissal" of the case under section 360, subdivision (b) deprives this court of jurisdiction to address the issues raised by mother and father.[2]
We conclude it is appropriate to address the merits of mother and father's appeals from the order for informal supervision. However, the evidence supports the order and no miscarriage of justice appears. We therefore affirm the orders of the juvenile court.

FACTS AND PROCEDURAL BACKGROUND

1. Detention of the children.

On May 11, 2009, the Los Angeles County Department of Children and Family Services (the Department) received a referral from the Women, Infants, and Children program. The program's nutritionist reported five-and-one-half-month-old Amy weighed six and one-half pounds at birth and now weighed only 10 pounds. Mother, who voluntarily was participating in the program, last took Amy to the doctor on January 27, 2009, and at that time Amy weighed eight pounds 13 ounces. Amy had not received recent immunizations and Amy's doctor indicated the normal weight for Amy at five and one-half months of age would be 16 pounds.
A social worker examined Amy and found she was very lean, her rib cage was pronounced and the skin on her legs appeared loose and wrinkled. Amy had minimal control of her head while being carried. The social worker insisted on a medical examination of Amy.
Amy was taken to a hospital where she weighed 8.8 pounds. Nurses attempted approximately seven times to draw blood from Amy without success. The emergency room doctor, Kennedy Peters, M.D., diagnosed Amy with failure to thrive with dehydration and admitted Amy to the pediatric unit.
In interviews, mother indicated she homeschools her three older children: Adam, age 10 years, Andrew, age eight years and Amber, age five years. Mother indicated she did not return to Amy's pediatrician for immunizations *1254 because Amy had a cold and mother understood she was on a waiting list for an appointment. Mother and father denied Amy was underweight and stated they believed Amy was healthy. Mother stated the Women, Infants, and Children program knew mother was breastfeeding and the nutritionist had never previously expressed concern with Amy's weight. The printed instructions mother received from the program directed mother to feed Amy cereal at the age of six months. Mother intended to start Amy on cereal she received from the program on May 11, 2009, but Amy was detained.
The Department found Amy's siblings had fallen behind on their immunizations and concluded their safety could not be assured in the home of mother and father and placed them with their maternal grandfather.
The next day, May 12, 2009, Amy was examined at Citrus Valley Medical Center by Dr. James Liu who assessed Amy's condition as "failure to thrive due to low caloric intakemost likely due to [mother and father's] lack of exclusive breast feeding knowledge ...." Dr. Liu indicated a child being exclusively breastfed should be fed every two hours. However, mother had been breastfeeding Amy every three to four hours. Dr. Liu noted Amy's development was delayed as she was not able to turn, a skill which is normally attained during the second month. Dr. Liu recommended metabolic testing and indicated Amy could be discharged but for the hold imposed by the Department. After Amy's condition stabilized due to a change in diet and feeding regimen, she was placed in foster care.
In the detention report, Adam reported being disciplined with a belt, a hanger and hands on the buttocks and that this discipline caused marks that lasted two days. Mother admitted Adam had been spanked on the butt with a belt and a hand but she had never noticed bruises. Mother stated that, to her knowledge, father has always used his hand to spank the children and Adam and Andrew have not been spanked for at least a year.

2. The dependency petition.

The dependency petition alleged physical abuse of Adam by mother and father. (§ 300, subds. (a), (b) & (j).) The petition also alleged failure to protect under section 300, subdivision (b) based on Amy's medical diagnosis of dehydration "due to being underfed and undernourished and being fed an inadequate diet" while in the care of mother and father. Another count under section 300, subdivision (b), alleged mother and father medically neglected *1255 Amy by failing to obtain necessary medical care for the child's severe lack of weight gain and dehydration. The petition further alleged Amy's siblings were at risk of neglectful conduct based on Amy's failure to thrive. (§ 300, subds. (e) & (j).)

3. The release of Amy's siblings to mother and father.

One week after they were detained, the juvenile court ordered Adam, Andrew and Amber released to mother and father on condition Adam and Andrew enroll in school. The juvenile court also granted the Department discretion to request a section 301 dismissal.[3] The juvenile court directed mother and father to enroll in parenting class and ordered a multidisciplinary assessment of Amy.
The Department reported Adam and Andrew were attending school with above-average grades.

4. Dr. Liu's interview statement.

Dr. Liu told a dependency investigator Amy's condition was the result of mother and father's lack of sufficient knowledge regarding the care of an infant and that Amy did not suffer from failure to thrive syndrome. Dr. Liu stated: "I don't know why it was called [failure to thrive] in the first place. It was probably somebody who admitted as an improper diagnosis." Dr. Liu stated: "When the baby was here, I told our social worker, this is not child neglect.... [¶] ... I never mentioned FTT [(failure to thrive)]. The baby's condition is not caused by parents' neglect. You cannot blame the parents. It's just the parents' lack of knowledge."

5. The release of Amy to mother and father.

The Department requested a referral for a failure to thrive workup at Children's Hospital and a medical examination of Amy under Evidence Code section 730. The Department indicated it would defer a recommendation on disposition pending further investigation.
At a hearing on June 30, 2009, the juvenile court noted the Department's allegation Amy was suffering from failure to thrive syndrome was "questionable," *1256 given that Dr. Liu could not make that diagnosis. Further, the Department was asking for a medical evaluation six weeks after detention to prove its case. The juvenile court found the delay "abominable." The juvenile court ordered the Department to provide counsel with Amy's medical records by July 17, 2009, and admonished the Department that, if the medical records did not show Amy suffered from failure to thrive syndrome, the Department was to bring the matter before the juvenile court by July 22, 2009, to address the release of Amy to mother and father.
On July 17, 2009, the Department filed an information for court officer report indicating Amy had an appointment for a failure to thrive assessment at the metabolic clinic at Children's Hospital of Orange County in August. Additionally, Amy was seen by Dr. Morkous on July 8, 2009, for a neurological evaluation and a followup appointment was scheduled for November 9, 2009. The Department requested additional time to complete the assessment and distribute the additional medical records. The Department noted Amy had consistently gained weight after removal from the care of mother and father.
On July 22, 2009, the juvenile court ordered Amy released to mother and father over the Department's objection. The juvenile court imposed numerous conditions including attendance at Amy's metabolic assessment and unannounced home visits by the Department. The juvenile court ordered a family preservation services referral for mother and father.

6. Mother and father's cooperation.

On August 5, 2009, a social worker provided mother and father with a release of information form for family preservation services. Mother and father stated they would speak to their attorney before they signed the form. On August 19, 2009, a public health nurse and a family preservation social worker made an unannounced visit. Both mother and father were home and Amy's development level appeared age appropriate. Amy sat independently with control of her head. She babbled and fed herself with her fingers. During this visit, mother and father stated they feel they do not need family preservation services and they do not have to agree to them. The social worker noted mother and father have not participated in counseling and it appears they are now resistant to family preservation services.
*1257 A metabolic assessment conducted on August 5, 2009, by Dr. Chang revealed Amy had risen to the 25th weight percentile for her height and age. Dr. Chang indicated no further metabolic testing was needed.
The Department reported Amy now weighed 17 pounds.

7. Adjudication.

On September 22, 2009, the juvenile court received into evidence proof mother and father had completed parenting class and a letter indicating Adam, Andrew and Amber were on a waiting list for counseling services.
The juvenile court dismissed with prejudice all counts alleging physical abuse of Adam. The juvenile court found the evidence showed only age-appropriate spanking.
The juvenile court sustained counts b-1 and b-2 as amended to allege Amy was dehydrated due to being underfed and undernourished and being fed an inadequate diet which was neglectful conduct by the parents. The petition also alleged mother and father failed to obtain necessary medical care for Amy's lack of weight gain and dehydration. The juvenile court struck the phrase "failure to thrive" and "deliberate, unreasonable" conduct and struck the allegation Amy's dehydration placed her siblings at risk of harm.

8. Disposition.

The juvenile court found Amy was a person described under section 300, subdivision (b), and then ordered the case "dismissed" under section 360, subdivision (b).[4] The juvenile court noted the children had been in the care of mother and father for a significant amount of time and the parents had been cooperative. The juvenile court advised mother and father to continue with the programs that had been set in place and indicated "the Department can refile if there is a problem ...." The juvenile court further stated: "While the matter is dismissed pursuant to section 360[, subdivision (b)], the Department may be involved in your lives in some way or form; is that understood?" Mother responded affirmatively.
County counsel inquired whether the juvenile court was ordering mother and father to participate in individual counseling and to follow up on medical *1258 appointments. The juvenile court directed the parents "to make sure that all medical appointments are kept for the child" and to participate with Amy in the Regional Center and to participate in individual counseling unless the children's therapist determines it is not needed.
Mother and father appeal the juvenile court's orders.

CONTENTIONS
Mother and father contend the evidence is insufficient to support the finding Amy was neglected within the meaning of section 300, subdivision (b), the juvenile court's jurisdictional finding resulted in a miscarriage of justice and the issues presented are not moot.
The Department contends the juvenile court's "dismissal" of the case under section 360, subdivision (b) deprives this court of jurisdiction to address the issues raised by mother and father.

DISCUSSION

1. The order for informal supervision is tantamount to a disposition which is an appealable order.

a. The arguments of the parties.

In their opening briefs, mother and father contend the juvenile court's "dismissal" under section 360, subdivision (b), does not render the case moot because there remains a potential for adverse collateral consequences in subsequent dependency or family law proceedings. (In re Joshua C. (1994) 24 Cal.App.4th 1544 [30 Cal.Rptr.2d 10].) They further note the juvenile court made orders that are inconsistent with dismissal and exceeded its jurisdiction. Also, dismissal of the appeal will operate as an affirmance of the underlying judgment or order, leaving mother and father without a means of seeking review of the juvenile court's jurisdictional findings. (In re Jasmon O. (1994) 8 Cal.4th 398, 413 [33 Cal.Rptr.2d 85, 878 P.2d 1297].)
The Department argues the juvenile court failed to comply strictly with section 360, subdivision (b), in that the juvenile court did not place the family under a program of supervision as provided in section 301 and order that services be provided. (Cal. Rules of Court, rule 5.695.)[5] Because the juvenile *1259 court did not order that services be provided to mother and father, the Department concludes there is no underlying superior court jurisdiction. Thus, the issue is not one of mootness, that is, a controversy rendered moot by subsequent events. (Woodward Park Homeowners Assn. v. Garreks, Inc. (2000) 77 Cal.App.4th 880, 888 [92 Cal.Rptr.2d 268].) Rather, at the time mother and father filed their notices of appeal, there was no justiciable controversy because there was no dependency petition to challenge. The Department concludes the issue is one of jurisdiction. (In re M.M. (2007) 154 Cal.App.4th 897, 913 [65 Cal.Rptr.3d 273] [transfer of case to tribal court deprived juvenile court of jurisdiction]; In re Michelle M. (1992) 8 Cal.App.4th 326, 330 [10 Cal.Rptr.2d 64] [juvenile court terminated jurisdiction while case on appeal and transferred jurisdiction to family law court].)

b. Informal supervision under section 360, subdivision (b).

(1) In order to address this contention, further explanation of the juvenile court's order under section 360, subdivision (b) is helpful. Seiser and Kumli, California Juvenile Courts Practice and Procedure (2009), discusses informal supervision as follows: "In some cases the parties may resolve an in-home case at disposition by recommending an order for informal supervision pursuant to Welf. & Inst. Code § 301(a). The court may also determine on its own or following a request by one of the parties that even though it has jurisdiction, the child is placed in the home, and the family is cooperative and able to work with the social services department in a program of informal services without court supervision that can be successfully completed within 6 to 12 months and which does not place the child at an unacceptable level of risk. In such cases the court may order informal services and supervision by the social services department instead of declaring the child a dependent [Welf. & Inst. Code § 360(b); see Welf. & Inst. Code § 301]." (Id., § 2.124[2], pp. 2-283 to 2-284.)
(2) "If informal supervision is ordered pursuant to Welf. & Inst. Code § 360(b), the court `has no authority to take any further role in overseeing the services or the family unless the matter is brought back before the court' pursuant to Welf. & Inst. Code § 360(c) [California Ctr. for Jud. Educ. and Research, Cal. Judge's Benchguides, Benchguide 102: Juvenile Dependency Disposition Hearing (March 2006) § 102.37 (Decision ProcessDeclaring Dependency), p. 102-30]. The court's lack of authority to take a further role in overseeing the services or the family is understandable, since if the court felt a need to supervise the matter it would have declared dependency.
*1260 "If the court agrees to or orders a program of informal supervision, it does not dismiss the dependency petition or otherwise set it aside. The true finding of jurisdiction remains. It is only the dispositional alternative of declaring the child a dependent that is not made. This is because if the family is unwilling or unable to cooperate with the services being provided, the social worker may institute proceedings pursuant to Welf. & Inst. Code § 332 (petition to commence proceedings), alleging that a previous petition has been sustained and that informal supervision was ineffective. [Welf. & Inst. Code § 360, subd. (c).] After hearing the petition, the court may either dismiss it or order a new disposition hearing ...." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure, supra, § 2.124[2], pp. 2-283 to 2-284.)
With this overview of informal supervision in mind, we turn to the issue presented.

c. Resolution.

The Department's claim this court lacks jurisdiction to address the issues presented is based on the juvenile court's failure to order informal services, as is required by section 360, subdivision (b) and California Rules of Court, rule 5.695(a)(2). However, it appears the orders made by the juvenile court, taken together, are the equivalent of an order for informal supervision. We reach this conclusion based on the juvenile court's specific and repeated references to section 360, subdivision (b) as well as the juvenile court's admonitions to mother and father to continue to cooperate with the programs in place and that the Department might continue to be involved with the family. Additionally, when the juvenile court released Amy to mother and father on July 22, 2009, it ordered a family preservation services referral for mother and father.
Further, the order for informal supervision under section 360, subdivision (b) must be seen as tantamount to a disposition. Any other result would insulate the juvenile court's jurisdictional finding from review in that, if mother and father cooperate with the Department, it is unlikely to petition for reinstatement under section 360, subdivision (c) which, if granted, will permit the case to proceed directly to disposition.
Our conclusion is buttressed by Seiser and Kumli, who observe neither the jurisdictional finding nor the dependency petition has been dismissed. Should mother and father cooperate with the Department or should the Department *1261 decide not to seek formal supervision, mother and father will be denied review of the jurisdictional findings that now form the basis of the order for informal supervision.[6]
(3) We therefore construe the order of the juvenile court for informal supervision under section 360, subdivision (b) as a disposition order. In dependency proceedings, the order entered at the dispositional hearing is a final judgment and thus is an appealable order. (In re Daniel K. (1998) 61 Cal.App.4th 661, 668 [71 Cal.Rptr.2d 764]; In re Sheila B. (1993) 19 Cal.App.4th 187, 196 [23 Cal.Rptr.2d 482] ["[T]he dispositional order is the adjudication of dependency and is the first appealable order in the dependency process."].)
Based on the foregoing, we address the merits of the claims raised by mother and father. We deny the Department's motion to dismiss the appeal as moot.

2. Sufficiency of the evidence.

Mother and father contend the sustained petition fails to support jurisdiction because there was no showing of neglectful conduct. Although mother's breastfeeding regimen of every three to four hours versus every two hours resulted in Amy's being underweight, there was no evidence Amy continued to be underweight at the time of the adjudication. Mother and father argue that because Amy was healthy and developmentally on track, and Dr. Liu stated Amy did not suffer from failure to thrive syndrome, there was insufficient evidence that, at the time of the adjudication, Amy continued to be at risk of harm in the care of mother and father. (In re Rocco M. (1991) 1 Cal.App.4th 814, 820 [2 Cal.Rptr.2d 429].)
(4) This contention fails because proof of current risk of harm is not required to support the initial exercise of dependency jurisdiction under section 300, subdivision (b), which is satisfied by a showing the child has suffered or there is a substantial risk that the child will suffer, serious physical harm or abuse. (§ 300, subd. (b); In re J.K. (2009) 174 Cal.App.4th 1426, 1435, fn. 5, 1436 [95 Cal.Rptr.3d 235] [noting In re Rocco M. considered a prior statutory scheme that was "materially different from the current version"].)[7]
*1262 There is no dispute Amy was underweight when she was detained. Also, Amy had minimal control of her head, her ribs were pronounced and the skin on her legs was loose and wrinkled. The emergency room physician diagnosed Amy with failure to thrive syndrome and dehydration and admitted her to the hospital. Nurses in the emergency room were unable to draw Amy's blood. When Dr. Liu was interviewed after the fact, he insisted there were no signs of failure to thrive syndrome. However, he also previously indicated Amy "fail[ed] to thrive due to low caloric intakemost likely due to lack of exclusive breast feeding knowledge" on the part of mother and father. Thus, the evidence adequately supported the finding mother and father neglected Amy.

3. The juvenile court's orders did not result in a miscarriage of justice.

Mother and father contend the evidence showed Amy recovered from dehydration the same day she was detained, Dr. Liu did not believe mother and father were medically negligent and mother and father had never been involved with the Department in the past. Further, at the time of the adjudication, Amy was thriving. Mother and father conclude the order for informal supervision under section 360, subdivision (b), permitted the Department to interfere in their privacy and amounts to a miscarriage of justice.
(5) This claim is meritless. The record shows that, although Amy was seriously underweight and developmentally delayed, mother and father refused to acknowledge Amy's medical condition or their responsibility for it. Thus, for the same reasons stated above in connection with the discussion on the sufficiency of the evidence to support the jurisdictional findings, neither the order for informal supervision nor the jurisdictional findings amounted to a miscarriage of justice.

*1263 DISPOSITION
The orders of the juvenile court are affirmed. The Department's motion to dismiss the appeal as moot is denied.
Croskey, J., and Kitching, J., concurred.
NOTES
[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.
[2] We previously deferred consideration of the department's motion to dismiss the appeals as moot.
[3] Section 301, subdivision (a) permits the Department to provide voluntary services to a family. It states: "[T]he social worker may, in lieu of filing a petition or subsequent to dismissal of a petition already filed, and with consent of the child's parent or guardian, undertake a program of supervision of the child.... If the family has refused to cooperate with the services being provided, the social worker may file a petition with the juvenile court pursuant to Section 332." (§ 301, subd. (a).)
[4] Section 360 states: "After receiving and considering the evidence on the proper disposition of the case, the juvenile court may enter judgment as follows: [¶] ... [¶] (b) If the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301."
[5] California Rules of Court, rule 5.695 provides that, at disposition, the court may, inter alia, "(2) Place the child under a program of supervision as provided in section 301 and order that services be provided ...."
[6] We note that, when the Department asked mother and father to participate in voluntary family preservation services under section 301, mother and father consulted their attorney and thereafter refused the Department's request and indicated it was their right to do so. However, it remains to be seen whether the Department will seek to reinstitute the case under section 360, subdivision (c), based on mother and father's failure to cooperate.
[7] In re J.N. (2010) 181 Cal.App.4th 1010 [104 Cal.Rptr.3d 478], disagreed with In re J.K., supra, 174 Cal.App.4th 1426, to the extent In re J.K. concluded section 300, subdivision (b) authorizes dependency jurisdiction based upon a single incident resulting in physical harm absent current risk of harm. In re J.N. found a single incident of drunk driving with children in the car did not support a finding of dependency under section 300, subdivision (b). In re J.N. reasoned that, under the holding of In re J.K., supra, at page 1435, a juvenile court could take jurisdiction but, absent a showing of current risk of harm, would be required immediately to terminate dependency under the final sentence of section 300, subdivision (b), which provides: "The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."

In the case before us, the juvenile court did not declare Amy a dependent child. We therefore need not consider whether mother and father's neglect of Amy would be sufficient to support a declaration of dependency. However, we note mother and father's neglect consisted of a course of conduct that placed Amy at risk of harm rather than a single incident of neglect.