Filed 6/24/14  In re G.C. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re G.C., a Person Coming Under the Juvenile Court Law. | B249155 |
| | (Los Angeles County Super. Ct. No. CK98135) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| RIGOBERTO C. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Frank H. Free, under appointment by the Court of Appeal, for Defendant and Appellant Rigoberto C.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant Mary C.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Appellant, the Minor.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Rigoberto C. (Father), Mary C. (Mother), and G.C. (the minor) appeal from the jurisdictional and dispositional orders of the juvenile court of April 25, 2013, declaring G.C. a dependent of the court (Welf. & Inst. Code, §§ 300, 360, subd. (d)),[1] allowing him to remain in his parents' physical custody, and ordering the Los Angeles County Department of Children and Family Services (DCFS) to provide family maintenance services. Appellants contend the court abused its discretion by declaring G.C. a dependent of the court at disposition, and should have instead ordered six months of informal supervision by DCFS pursuant to section 360, subdivision (b), under which G.C. and his family would not be subject to court supervision. We find no abuse of discretion and affirm the challenged orders.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    DCFS's Provision of Voluntary Services**

In 2009, DCFS received a referral alleging Mother and Father were neglecting G.C. At the age of 11, G.C. weighed 320 pounds, had been diagnosed with morbid obesity, and had not been seen by a doctor in four years. His school attempted to intervene but the parents were unresponsive. DCFS opened a family maintenance case pursuant to section 301 and provided the family with voluntary services from June 2010

---

[1]    All further statutory references are to the Welfare and Institutions Code.

2

through June 2011.  The family complied with medical referrals and made progress in managing G.C.'s weight, but they needed constant monitoring.  They failed to obtain an Up-Front Assessment as requested by DCFS.[2]

## II.    Events Subsequent to Cessation of Voluntary Services

In August 2011, DCFS received a report that G.C. was being severely neglected. A dependency investigator found the allegations inconclusive.

In May 2012, DCFS received a letter from St. John's Well Child and Family Center, where G.C. had been receiving medical treatment since January 2010.  St. John's reported regarding the history of G.C.'s care as follows.  At the time of his initial visit, G.C. weighed 336 pounds and had a body mass index of 56.  The child was examined by an endocrinologist in August 2010, but he was unable to return for follow-up care for a time because his parents lost his Medi-Cal coverage.  Seven months later, G.C. returned to St. John's and had blood work done, but Mother did not return with G.C. as instructed. She did keep an appointment with a nutritionist, but G.C. failed to follow through with most of the recommendations made by the nutritionist.  In May 2011, an endocrinologist diagnosed G.C. with morbid obesity and elevated LDL cholesterol, and other blood test results indicated possible liver damage and poor management of diabetes.  He was prescribed diabetes medication, and he was instructed to exercise for two hours daily and to monitor his diet.  He did not return one month later for additional lab work as instructed.  He continued to meet with a nutritionist until July 2011, when he stopped attending appointments.[3]  The nutritionist attributed G.C.'s inability to meet treatment goals to a lack of support from his parents.  G.C. had been referred to UCLA's fitness program, but Mother never took him.

---

[2]    Up-Front Assessments are performed by family preservation agencies at the request of DCFS and use a standardized assessment tool to evaluate caretaker capacity. Participation is voluntary.  (See http://lacdcfs.org/reunitingfamilies/docs/Up-Front%20Assessments%20(UFA)%20Info%20list.pdf (as of June 23, 2014).)

[3]    This timing coincided with the end of the voluntary family maintenance contract.

G.C. returned to St. John's in March 2012. At the time of that visit, unbeknownst to Mother he had gained 17 pounds in three months. Thereafter, St. John's staff attempted several times to schedule appointments but received no response. The parents did not make appointments with the cardiologist, the ear nose and throat specialist, or the endocrinologist to whom G.C. was referred.

Although the May 2012 letter from St. John's requested DCFS assistance in dealing with G.C., the record reflects that the social worker had lost contact with the family.

### III.    The Section 300 Petition

DCFS received a new referral regarding G.C. in December 2012. He had not been to the medical clinic in five months. A social worker at his school stated he was teased at school and got winded just walking across campus. She scheduled an appointment with Mother, but Mother said there was nothing medically wrong with G.C. and did not attend the appointment.

In January 2013, G.C. returned to see the nutritionist. At 14 years old, he weighed 425 pounds and had a body mass index of 64.91. He had gained 29 pounds in the preceding nine months since he was last seen.

St. John's medical staff opined that G.C.'s obesity resulted from parental neglect. G.C.'s primary care physician said that if the child did not lose a dramatic amount of weight soon he would not live long past the age of 20. A public health nurse who had worked with the family providing voluntary family maintenance services expressed concern because Mother did not follow through on efforts to help G.C. make the drastic changes necessary for him to lose weight. The DCFS social worker assigned to the case said the parents let G.C. do whatever he wanted and they required constant monitoring. She believed Mother used G.C. as her substitute husband to get the attention she was not receiving from Father.

Mother said she did not follow through with the referral to a weight loss clinic because it was too far away and she worked long hours. She admitted she had not

4

followed through on seeking mental health treatment for G.C., but promised she would do so. She said G.C. saw the doctor regularly. She maintained that the doctor said there was no medical issue.

On March 6, 2013, DCFS filed a petition pursuant to section 300, subdivision (b), alleging that G.C. had suffered or there was a substantial risk he would suffer serious physical harm or illness as a result of the failure or inability of his parents to supervise or protect him. The petition alleged that G.C. had gained 70 pounds since voluntary family maintenance services ended, that the parents failed to ensure G.C. ate healthy food, and that they failed to take him to medical appointments. DCFS did not seek to detain G.C. from his parents' custody. It reported that the family had been compliant with voluntary case services provided in 2010 through 2011, but the family stopped complying as soon as the case was closed. DCFS noted that G.C. denied Mother and Father were neglectful of his medical care and said he was to blame for his weight. Mother denied she was neglectful of G.C.'s medical needs and stated he was responsible for overeating and not engaging in physical activity. Mother said she had not followed through with medical appointments due to time constraints caused by having two jobs and because she lacked transportation. The social worker opined that G.C. should not be solely responsible for managing his own serious health conditions. The juvenile court found a prima facie case had been established and scheduled an adjudication hearing for April 25, 2013.

A team decision making meeting was held on March 26, 2013. The parties agreed to the following: DCFS and the parents would find an inpatient weight loss program for G.C.; DCFS would submit a referral for an Up-Front Assessment; DCFS would provide bus passes or tokens for transportation; G.C. would keep his appointment with Dr. Clark at Specialized Foster Care; the parents would request a student study team or individualized education plan for G.C.; the parents would ensure G.C. attended all of his medical appointments; the parents would provide G.C. with healthier food choices and an exercise regimen; and the parents would participate in family preservation services. The parents stated they understood that if they did not meet the objectives of the safety plan they risked losing custody of G.C.

5

At the jurisdictional and dispositional hearing held on April 25, 2013, the dependency investigator testified that when she met with the parents in early April, they had made an appointment for G.C. to be evaluated at an inpatient weight loss program through UCLA Fit. G.C. had kept his appointment with Dr. Clark, a specialist at the foster care office. Since the team decision making meeting one month earlier, G.C. had attended all of his medical and specialist appointments. DCFS had made a referral for an Up-Front Assessment for Mother, but she had not followed through. In that regard, the dependency investigator explained that Mother presented with a flat affect and there was concern that she might be suffering from depression, which would compromise her ability to care for G.C. The parents had requested a student study team or an individualized education plan for G.C. The dependency investigator did not know if the parents had been providing healthier food options for G.C. She stated the parents had been supporting him in his exercise program. G.C. was participating in individual therapy and seeing a nutritionist. He began participating in an exercise class at the Salvation Army in March 2013. His weight at the time of the jurisdictional hearing was 406 pounds, representing a loss of 17 pounds since early March 2013.

The dependency investigator testified that family preservation services would involve a social worker visiting the family once a week to support them in maintaining G.C.'s exercise and food regimen. The social worker also would assist with scheduling and keeping G.C.'s medical appointments, and determine any other assistance the family might require to meet his weight loss goals. She opined that G.C.'s parents had previously demonstrated their inability to continue with services without DCFS supervision. A family preservation referral had been made but those services were not yet in place.

The dependency investigator testified that if the court did not take jurisdiction over G.C., there was a risk that the parents would repeat the behavior that followed the cessation of voluntary services, and G.C.'s weight would continue to increase. Court intervention was required so DCFS would have the authority to supervise G.C.'s weight loss regimen.

6

Mother testified that she did not take G.C. to a podiatrist appointment in August 2012 because she had to work. She was working two jobs at the time, but she took a leave of absence from one of her jobs in January 2013 in order to have more time to devote to G.C.'s care. She was making sure he ate healthier food, and kept an eye on him to be sure he did not sneak food. He exercised at the gym five days a week, and she walked with him for 30 minutes on weekends. She baked food for family meals rather than serving fried food, and prepared G.C.'s school lunches. She said she had been trying to cook healthier meals for a long time. She had not had junk food or soda in the home for about six months. She and Father had been more responsible about keeping G.C.'s appointments by keeping a calendar since the juvenile court case was opened in March 2013. Mother did not agree that G.C.'s health had gotten worse in the last year because the doctor said G.C. was fine. She understood that if he did not get his weight under control he could die early, that he had diabetes, and that his cholesterol level was elevated but was improving. Mother did not feel she needed DCFS to supervise her family.

Father testified he had been unemployed since January 2013. After the case was opened, he had begun taking G.C. to the gym every day. They took everything more seriously after the case was initiated. Father had become more involved in G.C.'s medical care since he stopped working. He was looking for other work and although he remained committed to G.C.'s well-being, he acknowledged a new job might not permit flexibility.

Counsel for G.C., Mother, and Father all argued that juvenile court supervision was not required or appropriate in this case. Counsel for Mother argued that in the alternative the court should sustain the petition under section 360, subdivision (b).

The court specifically took note of Father's comment that the family took everything more seriously since coming to court. It found that without DCFS supervision, the family was not doing what needed to be done to control G.C.'s weight. Between the time the voluntary services ended and the new case was initiated, G.C. gained 70 pounds, "a huge amount of weight." The court sustained the section 300

7

petition as amended, found G.C. to be a person described by section 300, and declared him to be a dependent of the juvenile court. The court ordered DCFS to comply with the terms of the case plan, which included the following orders: G.C. was to participate in individual counseling and the family was to participate in conjoint counseling; DCFS was to provide a referral for family preservation services; DCFS was given discretion to make unannounced home visits; DCFS was to provide transportation assistance for the parents; and DCFS was to provide the parents with low cost or no cost referrals for services.

This appeal by Mother, Father, and G.C. followed.

## DISCUSSION

### I.    Jurisdictional Order

Mother and Father do not take issue with the juvenile court's finding that G.C. is a person described by section 300, subdivision (b), because G.C. had suffered or there was a substantial risk he would suffer serious physical harm or illness as a result of the failure or inability of his parents to supervise or protect him by ensuring he lost weight and attended all medical appointments. G.C. asks this court to reverse the jurisdictional finding, but fails to provide any argument or legal authority to support that request. He has therefore forfeited any claim of error on appeal as to the jurisdictional finding. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 410.) Accordingly, we affirm the juvenile court's jurisdictional finding that G.C. is a person described by section 300. We next consider the court's dispositional order.

### II.    Dispositional Order

Appellants argue on appeal that the juvenile court abused its discretion by declining to order informal supervision for the family under section 360, subdivision (b), because this option would adequately ensure G.C.'s well-being without the necessity of formal court supervision. As we shall explain, we disagree.

8

## A.    *The Applicable Law*

After finding that a child is a person described by section 300, the court then must consider the evidence on the proper disposition of the case.  It may enter judgment adjudging the child to be a dependent child of the court, pursuant to section 360, subdivision (d).  Alternatively, it may, without adjudicating the child a dependent of the court, order that services be provided to keep the family together and place the child and the child's parents under the supervision of DCFS pursuant to section 360, subdivision (b).  As explained by the court in *In re Adam D.* (2010) 183 Cal.App.4th 1250 (*Adam D.*): "Seiser and Kumli, California Juvenile Courts Practice and Procedure (2009), discusses informal supervision as follows:  'In some cases the parties may resolve an in-home case at disposition by recommending an order for informal supervision pursuant to Welf. & Inst. Code § 301(a).  The court may also determine on its own or following a request by one of the parties that even though it has jurisdiction, the child is placed in the home, and the family is cooperative and able to work with the social services department in a program of informal services without court supervision that can be successfully completed within six to 12 months and which does not place the child at an unacceptable level of risk.  In such cases the court may order informal services and supervision by the social services department instead of declaring the child a dependent [Welf. & Inst. Code § 360(b); see Welf. & Inst. Code § 301].'  (*Id.*, § 2.124[2], pp. 2-283 to 2-284.)

"'If informal supervision is ordered pursuant to Welf. & Inst. Code § 360(b), the court "has no authority to take any further role in overseeing the services or the family unless the matter is brought back before the court" pursuant to Welf. & Inst. Code § 360(c) [California Ctr. for Jud. Educ. and Research, Cal. Judge's Benchguides, Benchguide 102:  Juvenile Dependency Disposition Hearing (March 2006) § 102.37 (Decision Process—Declaring Dependency), p. 102-30].  The court's lack of authority to take a further role in overseeing the services or the family is understandable, since if the court felt a need to supervise the matter it would have declared dependency.

"'If the court agrees to or orders a program of informal supervision, it does not dismiss the dependency petition or otherwise set it aside.  The true finding of jurisdiction

9

remains.  It is only the dispositional alternative of declaring the child a dependent that is not made.  This is because if the family is unwilling or unable to cooperate with the services being provided, the social worker may institute proceedings pursuant to Welf. & Inst. Code § 332 (petition to commence proceedings), alleging that a previous petition has been sustained and that informal supervision was ineffective.  [Welf. & Inst. Code, § 360, subd. (c).]  After hearing the petition, the court may either dismiss it or order a new disposition hearing . . . . ' (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure, *supra*, § 2.124[2], pp. 2-283 to 2-284.)" (*Adam D.*, *supra*, 183 Cal.App.4th at pp. 1259-1260.)

Thus, after making a finding that a child is a person described by section 300, the court must make a dispositional decision either to declare the child a dependent of the court, or not do so if it finds that informal supervision by DCFS, without court supervision, will be adequate to protect the child.  "Once the juvenile court finds jurisdiction under section 300, it must adjudicate the child a dependent unless the severity of the case warrants nothing more than Agency's supervision of family maintenance services.  Under section 360, subdivision (b), if appropriate, the court may, without adjudicating the child a dependent, order that services be provided to keep the family together under the informal supervision of the child welfare agency.  (§§ 360, subd. (b), 301; Cal. Rules of Court, rule 5.695(a)(2).)

"*Whether to exercise this option under section 360, subdivision (b), is a discretionary call for the juvenile court to make*; *it may opt to do so*, *but it need not.* 'The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion.' (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.)  As an appellate court, we cannot reverse the court's dispositional order absent a clear abuse of discretion.  (*Ibid*.)  A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd.  The appropriate test is whether the court exceeded the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)" (*In re N.M.* (2011) 197 Cal.App.4th 159, 171, italics added.)

## B.    Discussion

Appellants contend that the court abused its discretion by declaring G.C. a dependent of the court and making the family subject to the court's supervision. They contend that because the family had complied with DCFS's requirements during the time they were subject to a voluntary service contract (pursuant to § 301), they had demonstrated that court supervision was not necessary to gain their compliance. Indeed, Mother contends that the court perhaps confused the statutory alternatives regarding informal supervision because in pronouncing judgment it stressed that the family needed DCFS's supervision, not the court's.

We find no abuse of discretion. The record on appeal supports the juvenile court's determination that formal court supervision was necessary and appropriate. It had before it evidence that the seriousness of the case warranted court supervision.

The year-long period of voluntary supervision in which the family participated from June 2010 to June 2011 was governed by section 301, which authorizes DCFS to engage in informal supervision where the social worker "determines that a child is within the jurisdiction of the juvenile court or will probably soon be within that jurisdiction." (§ 301, subd. (a).) Through the informal supervision, "the social worker shall attempt to ameliorate the situation which brings the child within, or creates the probability that the child will be within, the jurisdiction of Section 300 by providing or arranging to contract for all appropriate child welfare services . . . ." (*Ibid.*) These services generally do not extend beyond a period of twelve months. (See §§ 16506, 16507.3.) Thereafter, "[i]f the family has refused to cooperate with the services being provided, the social worker may file a petition with the juvenile court pursuant to Section 332." (*Id.*, § 301, subd. (a).)

Similarly, if informal services provided pursuant to section 360, subdivision (b) are ineffective, DCFS would then file a petition pursuant to section 332. The difference is that by proceeding under section 360, subdivision (b), DCFS would not first have to establish that the child is described by section 300, because that already would have been established. (*Adam D.*, *supra*, 183 Cal.App.4th at p. 1260.) Here, DCFS tried the least

11

intrusive option first (§ 301), and it proved to be ineffective over time. Indeed, the evidence showed that the parents' compliance during the period of informal supervision was deficient. The family made progress in managing G.C.'s weight, but they needed constant monitoring, and their follow-through with medical referrals was inconsistent. As soon as the period of informal supervision ended, the parents failed to monitor G.C.'s weight, and he gained 70 pounds after cessation of voluntary services. The parents did not seem to comprehend the gravity of the situation. Despite G.C.'s 70-pound weight gain, Mother insisted that his health had not gotten worse in the last year because the doctor said G.C. was fine. She said she understood that if he did not get his weight under control he could die early, but her actions were not congruent with that reality. Mother did not feel she needed DCFS to supervise and assist her family, even though she failed to follow through with G.C.'s medical care because she was overwhelmed by work demands and transportation difficulties. Granted, as of April 2013 she no longer had two jobs, but Father was not working and presumably the family would be subject to financial strain as a result. Given these circumstances, it was not arbitrary or capricious for the court to decide that its supervision of the family, and of DCFS's provision of services, would be appropriate and even helpful.

We flatly reject mother's contention that "the court's involvement with G.C. and his family added nothing to ensuring G.C.'s safety and well-being." In ruling, the court began its comments by noting that Father said the family had been taking the matter of G.C.'s health more seriously since they began coming to court. It is probable that the family's feeling of accountability was considerably heightened by the knowledge that their progress would be monitored by the court as well as DCFS. While the court did not want G.C. to be fearful of being taken away from his family, the court also recognized the possibility of that happening was a highly motivating circumstance for G.C. The court's supervision of the case made the gravity of the situation more of a reality for everyone. The court also recognized that the level of DCFS involvement that it was ordering would provide important emotional support to the parents as they faced the challenge of making drastic, *permanent* changes in G.C.'s lifestyle. The lack of any

12

lasting change as a result of the year of voluntary services supported the court's decision to declare G.C. a dependent of the court. It is not too dramatic to say that effecting a permanent lifestyle change for G.C. is a matter of life or death. It is evident that the court did not abuse its discretion.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.[*]

We concur:


WILLHITE, Acting P. J.


MANELLA, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13