Filed 5/10/24  In re Anastasia M. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re ANASTASIA M., a Person Coming Under the Juvenile Court Law. | B323657 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 22CCJP02196A) |
| Plaintiff and Respondent, | |
| v. | |
| JESUS M., | |
| Defendant and Appellant. | |

APPEAL from findings and an order of the Superior Court of Los Angeles County, Pete R. Navarro, Juvenile Court Referee. Dismissed as moot.

William Safford, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Jesus M. (father) appeals from juvenile court findings by which the court asserted jurisdiction over his newborn daughter, Anastasia M. The juvenile court did not declare Anastasia M. a dependent of the court; instead it issued an order for six months of informal supervision. (Welf. & Inst. Code, §§ 300, subd. (b), 360, subd. (b).[1] Father contends there is insufficient evidence to support the juvenile court's assertion of jurisdiction. He maintains that confusion about the parents' purported refusal to assent to potentially life-saving medical treatment just after the child's birth in early June 2022 was resolved and the child was not in danger by the time of the adjudication hearing. Thus, father insists there was no substantial evidence, at the time the court made its jurisdictional findings, that Anastasia was at substantial risk of suffering serious physical harm or illness for purposes of section 300, subdivision (b). Mother is not a party to this appeal. We dismiss the appeal as moot.

## FACTUAL BACKGROUND

Anastasia was born in the evening of June 2022. She was almost at full gestational age at birth but was very small (weighing just over four pounds), had a respiratory condition (rapid breathing) that worsened shortly after her birth, and was diagnosed with hypothermia and hypoglycemia. Two doctors from the hospital's neonatal intensive care unit (NICU) requested intervention by respondent Department of Children and Family Services (DCFS), after the parents purportedly refused to consent to certain medical treatments and threatened to leave the

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

hospital against medical advice with the newborn who required life-saving medical care and intervention.[2]  Dr. Amanda Jan, one of the NICU physicians who contacted DCFS, deemed Anastasia's prognosis as "grim," i.e., the infant was not likely to survive without the recommended medical intervention.

On June 2, 2022, a DCFS children's social worker (CSW) spoke with Dr. Jan at the hospital.  Dr. Jan told the CSW "[i]t was like butting heads, especially with the father who seem [*sic*] to distrust medical evidence."  However, by the time this conversation took place, the parents had agreed to permit the medical staff to perform some of the recommended procedures, such as giving the infant oxygen, doing blood sugar and blood gas tests, and taking an x-ray.  The parents still refused to consent to intravenous feeding, but Dr. Jan said that procedure and some others she previously had recommended were no longer necessary because Anastasia had shown a marked improvement.  Nonetheless, Dr. Jan remained concerned the parents would leave the hospital against medical advice with the child.  Anastasia was underweight, remained medically vulnerable and needed at least another 24 hours of observation.  The doctor said the child would need further monitoring and medical procedures in the NICU, and it was important that the parents continue to cooperate so their child could receive critical care.

---

[2]     The parents' actions were not based on religious beliefs, and father denies that the parents ever refused or withdrew consent for treatment.

The CSW met with the parents. Mother said she was not opposed to medical procedures, but believed some of the proposed treatments were unnecessary and invasive. For example, the medical staff had said Anastasia could not feed because of her breathing problems and staff wanted to insert a feeding tube into her throat. However, mother said Anastasia had quickly latched on to her breast and was feeding. Mother wanted to leave the hospital but told the CSW she would not do so until the baby was ready to go, and she would "not object to anything that [she] believe[d her] baby need[ed]." Father agreed.

After leaving the hospital, the CSW received a joint call from Dr. Jan and Dr. Nicholas Lynch, who was now the attending NICU physician. Both doctors informed the CSW that the parents had just withdrawn consent for treatment to which they previously had agreed, and the doctors were "back to square one." The doctors also said the parents had become belligerent and father was so disruptive the parents had to be escorted out of the NICU by security.

Dr. Lynch requested that DCFS intervene so Anastasia could receive expeditious treatment. He said the parents were refusing consent for necessary lifesaving medical procedures for a medically vulnerable newborn and that certain procedures were necessary to ensure the child's viability. One such procedure was the insertion of a breathing tube due to the baby's irregular breathing because, "[i]f you can't breathe you can't eat." He also said the child needed an intravenous feeding device to ensure she was adequately nourished, explaining that hypoglycemia was typical for underweight newborns and could lead to detrimental consequences or even death. Dr. Lynch explained that a child in Anastasia's condition had to be treated with urgency and

4

expressed concern because the parents had consented to certain procedures, then "turn[ed] around and withdr[ew] their consent." The parents had refused to permit the insertion of a nasogastric tube (NG tube) for feeding, the use of IV fluids, and oral feeding for their daughter.

DCFS contacted father who had left the hospital. He said he and mother had not withdrawn consent but remained uncomfortable with and had questions about some of the recommended procedures. Despite their concerns, father said the parents had acceded to the doctors' recommendations, including procedures with which they were uncomfortable.

On June 4, 2022, DCFS served the parents with orders for remedial medical treatment for Anastasia. Mother was surprised and confused. She said she and father had "not done anything wrong," and she personally signed consents for all proposed treatments. Mother denied the parents were disruptive in the NICU. She conceded they had demanded an "explanation and clarification" as to the necessity for some treatments (such as a feeding tube) but said they had not prevented any treatment. Mother opined that Dr. Lynch, in particular, did not like being questioned. Mother, who had some training as a medical assistant, was aware of the merits of medical science in delivering beneficial treatment. But she expressed skepticism about excesses by medical practitioners and noted it was the parents' responsibility to speak up for their baby. Mother believed she was now on the same page and working with the medical staff and looked forward to bringing Anastasia home.

Father also told DCFS he and mother had not withdrawn their consent but had questioned the need for some of the recommended procedures. Father believed he and mother had a good rapport with Dr. Jan but after Dr. Lynch took over, the communication began to break down and Dr. Lynch "seemed dismissive." Father also said Dr. Lynch ordered procedures that Dr. Jan had previously told the parents were no longer necessary because Anastasia was improving. Father admitted he became emotional in the NICU and could not bear the sight of the NG tube going down his daughter's throat.

On June 5, 2022, a NICU nurse told the CSW that Anastasia's condition had improved but the newborn still was not feeding or breathing well on her own and required oxygen. No discharge date had been set.

That same day, DCFS assessed the home in which the parents lived with their other daughter (then two years old). DCFS determined that the home was clean, safe and well-stocked with food and the toddler was safe in her parents' care. That child has never been a subject of this action.

On June 7, 2022, a NICU nurse informed DCFS that Anastasia was now tolerating room air and no longer required supplemental oxygen. The infant received full feedings and no longer had an IV. However, she still required an NG feeding tube because she could not fully tolerate all feedings. The nurse said a discharge date would be set once the baby was able to go 24 hours without needing the NG feeding tube.

## PROCEDURAL BACKGROUND

On June 7, DCFS filed a section 300 petition premised on the parents' medical neglect in refusing to allow Anastasia to

6

receive necessary medical treatment for her fragile condition.[3] (§ 300, subd. (b).)

At the detention hearing on June 8, 2022, each parent's counsel requested that Anastasia, once discharged, be released to the parents' home with protective measures in place. The court made emergency detention findings and trailed the hearing to the following day pending receipt of updated information about the infant's medical status and release date.

According to information presented by DCFS the next day, Dr. Jan reported Anastasia was stable and doing well, and Dr. Jan's initial concerns about the infant's rapid breathing and feeding had resolved. Mother was reportedly cooperating with medical staff and appropriately engaged in Anastasia's treatment

---

[3] The petition alleged:

"[§ 300](b-1): The child, Anastasia M[.]'s mother . . . and father . . . medically neglected the child, who was born underweight with respiratory issues and diagnosed with hypoglycemia, by failing to follow the appropriate steps to ensure the child receives appropriate medical attention for the child's health condition. On 6/6/2022, the child required continued admission to the NICU, requiring supplemental respiratory support/oxygen secondary to neonatal respiratory distress. The distress also necessitates nasogastric feeds. The child is severely small for the child's gestational age, putting the child at risk of hypoglycemia, if not given feeds. The parents have refused nasogastric feeds, IV fluids and oral feeds. The parents withdrew their consent for the child to have a breathing tube. Such medical neglect of the child on the part of the mother and father endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, danger, death and medical neglect."

7

and progress.  The infant was close to being discharged but had a blood clot in one leg and poor blood flow, so additional tests were needed.

On June 9, 2022, the juvenile court made a prima facie finding that Anastasia was a person described by section 300 and reasonable services were available to prevent detention.  It released the child–once discharged from the hospital–to the parents' home with safety measures in place, including parental cooperation and follow-up with medical professionals and DCFS, and the ability for DCFS to make unannounced home visits to check on the infant's welfare.  The adjudication hearing, initially scheduled for  July 19, was continued to August 19, 2022.

In its initial and interim reports for the combined adjudication/disposition hearing on July 19, 2022, DCFS informed the court that Anastasia had been discharged from the hospital on June 14, and released to the parents' care.  The infant was expected to receive subcutaneous injections twice daily for three months to treat an arterial blockage in one leg and had follow up appointments on August 4.

DCFS reported that a CSW met with the parents on July 6, 2022.  The parents denied the petition's allegations and claimed never to have refused medical treatment for Anastasia.  They said they had only questioned the diagnoses and proposed treatments and requested more information.  Mother said Dr. Jan was initially concerned that Anastasia's respiratory condition might be life threatening, but the newborn had breastfed well since her birth.  Mother acknowledged she had, at first, refused to permit the hospital to perform an X-ray on the infant.  Mother said that, the day after Anastasia's birth, Dr. Jan said the baby looked great and would be ready for discharge in a couple of days.

8

However, two hours after Dr. Jan's positive report, Dr. Lynch arrived and insisted on placing a feeding tube in Anastasia, even though mother believed the baby was breathing and feeding without any problems. She said Dr. Lynch refused to permit the nurses to feed the child without a feeding tube. The parents became upset after Dr. Lynch refused to explain the discrepancy between his assessment and Dr. Jan's, and security had escorted father from the NICU unit after he used vulgar language with Dr. Lynch. Mother said the NICU nurses made her feel pressured to sign medical consent forms for fear they would not feed the baby. She defended her and father's behavior and believed Dr. Lynch simply disliked having his treatment plan questioned. Mother claimed a DCFS social worker had assured her she had done nothing wrong.

During his interview, father told DCFS that, apart from a slight breathing issue, Anastasia was born small but healthy, and the "doctors told [him and mother] there was no need for the NICU because everything was good," but also said the infant needed "stronger" breathing. He said Anastasia was perfectly fine the next day. Father claimed Dr. Lynch gave the parents "suspicious" information and that it was he, not father, who had become upset and loud in the NICU. Father stated, "At the end, the doctors decided to use a breathing mask, a feeding tube that made my baby's nose bleed and a lot of other things without our consent," and said Dr. Jan later apologized that Anastasia "got a lot of procedures . . . that she didn't need."

As for Anastasia, mother told DCFS the infant had a good appetite and was breastfeeding well. She had a well-baby check and an appointment with the radiology vascular and general surgery departments to check on the blood clot scheduled for

August 1 and 9, 2022 respectively.  The parents had not yet been asked to enroll in any services but remained cooperative with DCFS for home visits and assessments of Anastasia's well-being. DCFS had assessed the home in which parents lived with their other child.  The home was "very child friendly and safe," and the toddler was clean, healthy, well–groomed and appeared to be well cared for by the parents.

On July 20, 2022, a public health nurse reviewed Anastasia's medical records which reflected the parents' resistance to medical intervention and their refusal of care for their newborn on June 1 and June 2.  The records showed that, on June 1, father resisted medical intervention even after Dr. Jan expressed the need to admit Anastasia to the NICU due to "continued respiratory distress, hypothermia, hypoglycemia."  On June 2, mother signed documents refusing oxygen, an incubator, blood culture and sugar tests, IV fluids, gavage feeding, and other recommended treatments.[4]  Nevertheless, Anastasia was placed on a feeding tube due to concerns about her aspiration and had a feeding tube for three days before being transitioned to oral feeds. The infant had also shown signs of respiratory distress and was placed on oxygen from June 2 through June 6.  By June 10, the baby no longer required supplemental oxygen.  However, hospital records also reflected that, on June 10, after the medical team noted that Anastasia was small for her gestational age and wanted to rule out sepsis, the parents refused to permit medical staff to perform a complete blood count test.

---

[4]     The record does not include documents signed by either parent reflecting either their refusal or consent to treatment.

10

Mother had cancelled a June 16, 2022 hematology appointment which was rescheduled for July 25, and Anastasia had a two-month-old well-child exam scheduled for August 18. A hematologist was concerned that Anastasia might have a coagulation disorder that causes life-threatening blood clots to form, but mother said the baby had seen a vascular and pediatric surgeon on August 9 and the doctors reported the child had a "good blood flow." Anastasia's treatment plan included remaining on medication another month, followed by an ultrasound and an appointment with the vascular and pediatric surgeon. The nurse also reported that during an August 10 visit "[b]oth parents were observed to be great parents and highly protective of their children[,]" and Anastasia now weighed 10 pounds and appeared to be in good health.

DCFS remained concerned about the parents' lack of cooperation with medical staff after Anastasia's birth, potentially subjecting the newborn to the possible risks of illness or death due to their refusal to consent to life-saving medical treatment. The parents were not yet enrolled in any services but remained willing to comply with court orders and to enroll in classes beneficial to Anastasia's health and well-being. DCFS recommended the juvenile court sustain the petition, permit Anastasia to remain in her parents' custody and care, and order DCFS to continue to monitor the parents' cooperation with the baby's medical treatment plan.

At the combined jurisdiction/disposition hearing on August 19, 2022, DCFS's reports were admitted into evidence and the parties presented closing arguments. Counsel for both parents requested the petition be dismissed, arguing that Anastasia was doing very well in parental care and had grown to over

11

10 pounds. They argued this was a case in which the "situation [had been] blown out of proportion" but was really no more than "a difference of opinion between the parents and one of the doctors." Father's counsel also noted the court was required to consider the circumstances at the time of the adjudication hearing, and there was "no evidence to support jurisdiction today." Anastasia's counsel concurred and submitted the matter. She noted the child was improving and, with DCFS's and the court's involvement, the parents were caring well for Anastasia and meeting her medical needs. Counsel argued that as of the date of the adjudication hearing, she did not "know what we have to sustain the petition."

DCFS requested that the court sustain the petition, observing that the parents' lack of cooperation and refusal to consent to necessary medical treatment prompted the NICU doctors to request DCFS intervention. DCFS observed that, although it was prudent to ask questions, the parents were "diligent to the extreme," and had forced DCFS to bring the matter to the court's attention by giving and then reneging on consent for treatment during a "life-and-death" situation. Counsel opined it was "an overstatement to say that this was blown out of proportion because the proportions [were] daunting," and the risk for the child with "special medical needs" remained "very grave." DCFS requested that the court order ongoing oversight, noting that once DCFS and the juvenile court got involved, the parents became more cooperative and diligent in ensuring that Anastasia received proper medical care.

The juvenile court sustained the petition as pled. It found the parents' medical neglect had placed Anastasia at ongoing risk of harm. In sustaining the petition, the court referred to the

doctors' concerns about parental refusal to permit Anastasia to undergo necessary medical procedures. The court admonished the parents to listen to the medical experts and observed that had parents' refusal to permit treatment been followed, Anastasia's condition "could have turned out much different[ly]." Without declaring Anastasia to be a dependent of the court, the court ordered informal DCFS supervision and the provision of appropriate services for a six-month period. (§ 360, subd. (b).) Father interjected that Anastasia was thriving. He believed the parents had been "cooperating . . . every single time," the DCFS report contained lies and "many . . . things were . . . blown out of proportion." The court stated everyone "recognize[d] that the baby [was] thriving . . . ." and the court simply wanted to ensure that she continued to do so. The court also observed father's comments "lead [it] to believe that it [was] even more appropriate that there be" continued contact with DCFS "because [father was] taking [the court's findings] as an assault on [his] integrity, on [his] parenting skills" which was not the case. Father filed this timely appeal.[5]

While this appeal was pending, the six-month period of informal supervision lapsed as a matter of law. (See §§ 301, subd, (a), 16506, subd. (b).) The record contains no evidence–nor has either party requested that we take judicial notice of any post-disposition evidence–that the juvenile court extended the period of informal supervision, or that DCFS filed a new petition.

---

[5]     Although father challenges only the jurisdictional findings, he also appealed from the court's order for informal supervision. (§ 360, subd. (b).) An informal supervision order is an appealable disposition order. (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.)

# DISCUSSION

Father contends the juvenile court erred in sustaining the petition's allegations because the record lacks substantial evidence that Anastasia was at risk of serious physical harm or illness in her parents' care at the time of the adjudication hearing. Even were we to decide in favor of father, we conclude this court can provide no effective relief. Accordingly, we dismiss the appeal as moot.

The parties acknowledge this matter is at least technically moot. First, the juvenile court sustained allegations concerning both parents, but only father challenges the jurisdictional findings. The unchallenged jurisdictional findings against mother will not be reversed regardless of the outcome of this appeal. As a general rule, a jurisdictional finding as to one parent is good as to both. (*In re Briana V.* (2015) 236 Cal.App.4th 297, 308.) Second, in February 2023, the six–month period of informal supervision lapsed as a matter of law and there is no evidence DCFS sought to extend the court's supervision or that the agency filed a new petition. Before determining whether to exercise our discretion to address father's contentions on the merits, we must decide if we can provide effective relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status. (See *In re D.P.* (2023) 14 Cal.5th 266, 276 [matter is moot if appellate court cannot provide effective relief]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.) We conclude we cannot.

We retain discretion to consider the merits of a moot appeal "when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the

14

current or future dependency proceedings [citations]; or (3) "could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763, disapproved on another ground by *In re D.P., supra*, 14 Cal.5th at p. 283.) Father argues that, although the appeal is technically moot, we should exercise our discretion to address the merits because there is a "possibility" of future court orders which may be impacted by the court's jurisdictional findings. Given the absence of a request that we take judicial notice of post-dispositional orders or events, we assume no such orders have been issued in at least 20 months since the court ordered informal supervision, and the matter was effectively dismissed as a matter of law by virtue of the lapse of time for statutorily authorized informal supervision. Father asks us to speculate about future court orders, but there is no new dependency proceeding at this point, and father presents no specific reason why we should address the merits here. While we do not reach the merits, we note that according to the trial court, Anastasia was thriving while in her parents' care when it found a basis for jurisdiction.

Our duty is to decide actual controversies, not to render opinions on moot questions or abstract propositions. (*In re D.P., supra,* 14 Cal.5th at p. 276.) This case is moot. By operation of law, the juvenile court's order of informal supervision pursuant to section 360, subdivision (b) lapsed by February 19, 2023, and there is no indication that DCFS filed a petition pursuant to section 332.[6] (See §§ 360, subd. (b), 301, subd. (a) [Where

_____

[6]   In cases in which a family refuses to cooperate with services provided pursuant to an order of informal supervision,

15

program of informal supervision is undertaken, DCFS shall attempt to ameliorate the situation that created the probability a child would be within the jurisdiction of section 300 by providing or arranging for appropriate child welfare services pursuant to section 16506, within the time period specified in that section. No further child welfare services shall be provided subsequent to these time limits.], 16506, subd. (b) [For families whose child is in potential danger of neglect, who are willing to accept and participate in appropriate services, and where it is safe for the child to remain in the family home, family maintenance services provided or arranged for by DCFS "*shall be limited to six months, absent a request for extension.*"  (Italics added.)]].)

### DISPOSITION

The appeal is dismissed as moot.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**




STRATTON, P. J.


We concur:




GRIMES, J.                    VIRAMONTES, J.

---

DCFS may file a new petition with the juvenile court pursuant to section 332.  (§ 301, subd. (a).)


16