Filed 8/18/14  In re Samatha S. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re SAMANTHA S., a Person Coming Under the Juvenile Court Law. | B251914 (Los Angeles County Super. Ct. No. CK99907) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JASON S., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Philip L. Soto, Judge.  Affirmed.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Jason S. (Father) challenges an order establishing dependency jurisdiction over his daughter Samantha. Jurisdiction lies from the unappealed findings against the child's mother: Samantha is a dependent if the actions of either parent bring her within the scope of the Welfare and Institutions Code. Father also contests the court's refusal to give him custody of the infant. We affirm.

## FACTS

Samantha was born in June 2013 to Melissa L. (Mother), who expressed suicidal ideation; had "continuous intrusive thoughts of 'molesting' her newborn child"; and was afraid to be left alone with Samantha. The hospital reported Mother to a child protection hotline. A nurse at the hospital observed that Mother "does not show interest in holding or providing care of [the] newborn child."

Mother has an obsessive-compulsive disorder (OCD). In 2008, she was prescribed psychotropic medications, but stopped taking them because they "made her feel weird." Mother was hospitalized in January 2013, during her pregnancy, after she saw scissors and thought about stabbing herself. In March 2013, Mother entered an in-patient treatment program. She was not sure what to do with her newborn.

Mother described incidents of domestic violence in an interview with the Department of Children and Family Services (DCFS). She stated that Father "hit me across the face" a year earlier. There were "10 other incidents in which the father has been physically aggressive with her." Two years earlier, Father held her neck but did not choke her. Mother did not call the police.

Father made no preparations for Samantha's birth, such as buying a crib, saying that "he can buy stuff for the baby whenever." He has known Mother for five years, and acknowledged that she has a mood disorder. He does not believe that Mother is suicidal, although she was hospitalized for mental health issues. Father described Mother as "stressed through her pregnancy," but opined that Mother just likes to be the center of attention and to blame others for her problems.

Father denied domestic violence. While maintaining that "he has never hit mother[,] Father stated that mother has hit him as well as other people." Father hoped to

2

build a support system for Samantha, and wanted custody "after he is able to get his support group ready." Father proposed living with Mother to help her care for the baby, or Samantha could stay in a foster home until Father is ready with his support group. He resides with his parents, who have "not authorized" him to bring Samantha into their household; he had no idea when they might allow Samantha to live with them.

In a meeting with DCFS, Mother stated that she has not held her three-day-old infant and would not feel comfortable doing so: she fears "molesting" the baby or not doing something properly. Mother could not detail what she means by "molesting" but denied thoughts of sexual abuse. She "is not ready to provide care for Samantha. Mother stated that she would like to work on her Obsessive-Compulsive Disorder then work on learning how to care for Samantha." Father announced that "there is not enough time to come up with a plan," although a social worker pointed out that he was aware of Mother's pregnancy for months and had not devised an appropriate plan for the baby. Father had no answer and no suggestions.

A safety plan was implemented because Mother is unwilling to hold Samantha and has thoughts of harming the baby. Plus, Father cannot currently care for the infant: he has no place for her to live and will be starting school within a few months. Samantha was taken into protective custody and placed with maternal aunt Rebecca L.

On June 7, 2013, a petition was filed alleging that Mother and Father engaged in violent altercations, and Mother has mental and emotional problems that render her unable to provide regular care for Samantha. The incidents of domestic violence and Mother's mental illness place the baby at risk of serious physical harm. The juvenile court found a prima facie case for detaining Samantha. Father did not attend the hearing. The court removed the infant from parental custody and ordered reunification services, including monitored visits by both parents.

In an interview for the jurisdiction/disposition report, Mother stated that the incidents of violence "were a while ago. I'm not really worried about it happening now. The last one was in 2011. He (father) put his hand around my throat. He pushed me against the wall and threatened to bash my head into the mirror on the wall. He said he

was trying to teach me a lesson. I don't know what exactly happened to set him off. There was also something in 2012 when he hit me on my face with an open hand. There was redness or something around my nose. It was hurting for a few days. He was saying it would heal quickly. But it took one or two days for it to stop hurting. He's hit me like five times since I met him in '08. He's hit me with [an] open hand on my face and eye. One time, he hit me on the face with a rag that had grout stuff on it."

Father said, "There were never any physical altercations between me and Melissa. We've had arguments. But it was never physical on my part. She has been physical towards me. She's hit me on several occasions. It was usually on my arm or hand, just in general she swings away. She'd do it with a closed hand. This has happened like a half a dozen times for a period of five years. I would just take it. I wouldn't do anything else. I never slapped her in the face. I never put my hands around her throat. I never hit her." Father believed that Mother fabricated claims about his violence because she was told by other psychiatric patients that DCFS would not remove the baby from Mother's custody and give it to Father if there was domestic violence. Father added that Mother attacked him and a friend while they were driving.

Maternal aunt Rebecca L. informed DCFS that Mother reported incidents of domestic violence right after they occurred. One year ago, Father slapped Mother across the face and scratched her cornea. In 2011, Father threw a trash can at Mother, who called Rebecca L. about the incident. There were several other times that Mother told Rebecca L. about Father hitting her or pushing her. This has been "ongoing since 2008." "The last time she said anything to me about him hitting or pushing her was about nine months ago. She seems to be afraid of him and tries to make it seem like the incidents are not that bad." Rebecca L. opined that Father seems to "take advantage of Melissa," by demanding that Mother agree to either pay him $20 or have sex with him if he comes to visit her.

Rebecca L.'s husband Daniel stated that Father instructed Mother to buy items for the baby and that they would "split the cost." However, Father never reimbursed Mother. When Daniel asked Father not to take advantage of Mother because of her mental illness

and to pay his debt to Mother, Father threatened to sue Daniel for "practicing illegal debt collection." Mother and Father are no longer a couple.

Mother acknowledged that she was diagnosed with OCD at age 15. At 22, she was prescribed medications, but stopped using one of them because she was worried about having a stroke, a side effect listed on the label. Mother was hospitalized during her pregnancy because "I was stressed. . . . I was having trouble thinking straight and I felt suicidal. I saw a pair of scissors in front of me and I thought I could actually do it (attempt suicide). This was in January this year." While hospitalized, Mother was given Prozac, but stopped taking it the day after she was released. In February 2013, Mother was rehospitalized because she contemplated suicide after not going through with an abortion. She stopped her medication because "it made me feel numb sometimes." Mother returned to the psychiatric hospital in March 2013, "because I was getting panicky about my situation." She was prescribed Zoloft, which she takes daily. She is feeling more stable now. Mother enrolled in counseling after giving birth and intends to undergo a psychiatric evaluation. She feels that she will benefit from talk therapy and medication.

Father was aware of Mother's mental health issues. As far as he knew, she was taking medication since the beginning of 2013. She told him, at least once, that she was claiming to be suicidal in order to get admitted to a psychiatric hospital. "Recently, like last Thursday, she told me that she would like to kill Samantha. She didn't say how." Father noted that when Mother was hospitalized, just before she gave birth, "she said she wanted to take scissors and jab it through her abdomen to kill the baby. I didn't notify staff about what she said because I didn't think it was viable. I didn't think she had access to scissors there." Father would like Samantha released to his care and does not believe he needs any counseling or parenting classes.

Samantha was removed from Rebecca L.'s home because Rebecca and her husband smoked marijuana and would not submit to on-demand drug tests. Samantha was in foster care. Mother was reluctant to hold Samantha during monitored visits because she is afraid of hurting her and continues to have intrusive thoughts of molesting

5

the baby. Father visits Samantha weekly, for two to three hours per visit. He requested additional visitation time. He needs coaching and guidance, but is open to feedback on how to hold and care for the baby. Father signed a statement acknowledging paternity, and was declared a presumed father.

Father asked DCFS to consider an e-mail from Mother, purportedly recanting her claims of domestic violence. Later, however, Mother notified the social worker "that she only recanted the domestic violence to please the father, who does not want to attend classes." Father's long-time female friend opined that Father "'is not the type of person' to engage in violence. He has never been violent with her . . . . She has seen him become angry and yell, but he has never become physical." The paternal grandfather has known Mother for five years. Although the couple did not live in his home, he stated that "there was no domestic violence," and both were very quiet. A male friend of Father's and Mother's stated that he saw Mother "beat up" Father in a restaurant two years ago, becoming upset when Father suggested that she would not qualify for a credit card. Mother struck Father in the arm and face multiple times. In addition, Mother struck the male friend in 2010, with a closed fist, when he drove her to a store to shop for groceries. He stated that Mother admitted to lying about domestic violence because she did not want Father to take custody of Samantha.

Mother began to learn parenting techniques: she now has physical contact with Samantha and feels a connection to her daughter. She reported no thoughts of hurting Samantha, but does not know what to do when the baby cries. Mother's discomfort caused Samantha to stress and cry more. With the help of the monitor, Mother made efforts to keep trying until she was able to soothe the baby. Mother stated that she has never used drugs or alcohol. She was scheduled for an intake appointment with a psychiatrist and planned to proceed with counseling. Mother felt emotionally unstable because she was uncertain what she wants for the future. Her unplanned pregnancy induced anxiety, fear and stress; the thought of having to co-parent with Father was also stressful.

6

Samantha is thriving in foster care, and bonding with the foster family: she smiles and coos when they engage with her. She eats and sleeps on schedule, cries only to get basic needs met, and is easily soothed. She is developing on track and does not seem to have any impairments.

The jurisdiction hearing was conducted on August 27, 2013. Father stipulated that he has completed five parenting sessions and is willing to finish the course. He asked the court to strike the domestic violence allegations because Mother's statements were "barely corroborated by any other independent evidence" such as a police or medical report. He discounted Rebecca L.'s claim that Mother reported the violent incidents when they occurred, because "the maternal side does not get along with [Father]." Father continued to argue that he never hit Mother. Mother's attorney noted that the altercations appear to have been mutual, with both parents being aggressors.

The court dismissed an allegation that Samantha is at risk of serious physical harm due to Father's domestic violence. It sustained allegations that (1) Mother and Father engaged in violent altercations in which both parents were mutually aggressive toward each other. This violent conduct endangers Samantha's health and safety; (2) Mother has mental and emotional problems, including a diagnosis of OCD, and has suicidal and homicidal ideation, which render her unable to regularly care for Samantha. Mother failed to take prescribed psychotropic medication, and was involuntarily hospitalized in 2013. Her mental and emotional condition places Samantha at risk of harm.

At disposition, Father offered stipulated testimony that he has a crib, food and clothing for Samantha, and he and his parents are ready to receive the infant at their home. The court declared Samantha to be a dependent of the court, and ordered reunification services. Mother must take a domestic violence class; parenting; and participate in individual counseling to address mental health issues and nonviolent conflict resolution. Father was ordered to participate in a 52-week domestic violence course and parenting. The court found that a substantial danger exists to the child and there is no reasonable means to keep her safe without removal from parental custody.

Both parents were authorized to have monitored visits. DCFS has discretion to place the child with suitable relatives and to liberalize visitation. Father appeals.

## DISCUSSION

The disposition order is appealable. (Welf. & Inst. Code, § 395; *In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.)[1] In challenges to dependency jurisdiction and disposition, "'we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

### 1. Juvenile Court Jurisdiction

Father contests the sufficiency of the evidence supporting the jurisdictional findings. No challenge is made to jurisdiction based on Mother's conduct. "[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring her within one of the statutory definitions of a dependent." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) It is irrelevant which parent created endangering circumstances for the child. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.) Because the proceeding is undertaken to protect the child, we must affirm if there is any basis for asserting jurisdiction. (*In re Alysha S.*, *supra*, 51 Cal.App.4th at p. 397; *In re I.J.*, *supra*, 56 Cal.4th at p. 773; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72.)

"Father asks us to review the evidentiary support only for the juvenile court's jurisdictional findings involving *his* conduct. Because he does not challenge the jurisdictional findings involving Mother's [conduct], however, any decision we might render on the allegations involving Father will not result in a reversal of the court's order

---

[1]     All statutory references in this opinion are to the Welfare and Institutions Code.

8

asserting jurisdiction. The juvenile court will still be entitled to assert jurisdiction over the minor on the basis of the unchallenged allegations. Further, the court will still be permitted to exercise personal jurisdiction over Father and adjudicate his parental rights, if any, since that jurisdiction is derivative of the court's jurisdiction over the minor and is unrelated to Father's role in creating the conditions justifying the court's assertion of dependency jurisdiction." (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492.)

In any event, substantial evidence supports the jurisdictional findings against Father. Relying on section 300, subdivision (b), the court found that Mother and Father engaged in mutual physical aggression, and that the violent conduct on the part of the parents toward one another endangers Samantha's physical health and safety.[2]

Evidence from a single witness, even a party, is sufficient to sustain the juvenile court's findings. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) The record contains statements from Mother describing, in detail, incidents of domestic violence by Father. He put his hand around her throat; pushed her against a wall; threatened to bash her head into a mirror; struck her face with his hand; hit her face with a rag that had grout on it; and scratched the cornea of her eye. Mother's statements were perfectly lucid. The baby's maternal aunt, Rebecca L., confirmed that Mother told her about Father's violence when it occurred, noting that the incidents were ongoing since 2008.

The court plainly accepted the veracity of Mother's statements, and disbelieved Father and his character witnesses. Although the court initially voiced some skepticism about Mother's credibility, county counsel allayed those concerns, noting that Mother's statements had a "level of detail that we normally don't get when somebody is fabricating

---

[2] A child may be declared a dependent of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or the willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . ."

9

the story." If the court had disbelieved Mother, it would not have found that the parents engaged in mutual aggression.

Although Father disparages Mother due to her mental health issues, the trier of fact believed Mother. We do not re-determine witness credibility on appeal. Father also disparages the court's reliance on "hearsay" from Mother regarding his violent acts. "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based." (§ 355, subd. (b).) An exception may apply if a party "raises a timely objection to the admission of specific hearsay evidence contained in a social study." (§ 355, subd. (c)(1).) Father has not cited any objections he raised below to evidence in the DCFS reports. Mother's statements are admissible and properly served as the basis for asserting jurisdiction.

Exposure to domestic violence may serve as the basis for jurisdiction under section 300, subdivision (b). (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.) A child could be accidentally struck during a parental fight, and studies show violence between parents harms children. Past violence in a relationship is a good predictor of future violence, because the perpetrator uses it to control others. (*Id.* at pp. 941-942.) Jurisdiction is necessary in this case because Father's conduct poses a risk of serious harm to Samantha.

## 2. Disposition Order

Father assails the sufficiency of DCFS's showing that Samantha faces a substantial danger to her physical health, safety, protection or emotional well-being if placed in his custody. (§ 361, subd. (c)(1).) He asserts that DCFS "did not present any evidence to suggest that [he] had ever directed violence toward Samantha, or that he was a generally violent person that would presumably expose the minor to violence in the future."

The juvenile court "'has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.'" (*In re Corrine W.* (2009) 45 Cal.4th 522, 532; *In re Jose M.* (1988) 206

Cal.App.3d 1098, 1103-1104.) In making its determination, the court considers "a broad spectrum of evidence shedding light on the circumstances of the minor and his or her family." (*In re Rodger H.* (1991) 228 Cal.App.3d 1174, 1183.) Only in an "exceptional case" should an appellate court determine which parent should have custody. (*In re B.G.* (1974) 11 Cal.3d 679, 699.)

Mother offered evidence that Father was violent toward her, and Father offered evidence that Mother hit him. This formed the basis for the court's finding that Father and Mother engaged in mutual aggression. The court could infer that Father is unable to control his anger in close personal relationships, when dealing with a troubled or difficult individual. It is not a far reach to conclude that Father's anger or frustration could be provoked by an unruly child. The court need not wait until the child is actually harmed before intervening. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1002-1003.) Father's propensity for violence toward women poses a potential detriment to Samantha.

Apart from displaying violent tendencies, Father consistently told DCFS that he was not prepared to take custody of Samantha. Despite his awareness of Mother's pregnancy, Father claimed a lack of time "to come up with a plan." He purchased no essentials for Samantha before her birth; he was willing to place his daughter in foster care until he organized a support group; and he had no place for her to live. It was not until the moment of disposition that Father first claimed an ability to take custody.

Father's inability to take responsibility for parenting a child—coupled with his lack of insight into the dangers of domestic violence—support a finding that Father should not take custody of Samantha until he has participated in the court-ordered case plan. Father continues to socialize with Mother in restaurants and at his parents' home, despite telling DCFS that only days earlier, Mother "told me that she would like to kill Samantha." Father's ongoing relationship with the possibly homicidal mother of his child places Samantha at risk of harm.

11

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.