Filed 4/15/21  In re M.C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.C., A Person Coming Under the Juvenile Court Law. | B308713 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSHUA C.,<br><br>    Defendant and Appellant. | Los Angeles County Super. Ct. No. 20CCJP03136 B |

APPEAL from an order of the Superior Court of Los Angeles County, Emma Castro, Judge Pro Tempore. Affirmed.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Joshua C. (father) appeals from the juvenile court's informal supervision order issued after the court found he and Melissa G. (mother) medically neglected their infant daughter. On appeal, father argues insufficient evidence supports the court's jurisdiction finding. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and father have two children. Their son was born in July 2018, and their daughter was born in August 2019.[1] Their daughter was born premature and spent the first several months of her life in the neonatal intensive care unit (NICU). She was diagnosed with clubfeet and needed a gastrostomy tube (G-Tube) inserted through her stomach because she had difficulty ingesting food orally.

When their daughter was discharged from the NICU, the parents were provided a list of doctors and specialists with whom they were supposed to follow-up for their daughter's treatment. According to the child's occupational therapist, the parents were specifically instructed to make appointments with the doctor who installed the G-Tube, a neurologist, and an orthopedic therapist.

In May 2020, the occupational therapist reported that the parents failed to schedule, and failed to attend several scheduled, follow-up appointments for their daughter. Although their daughter hadn't needed the G-Tube since January, the parents missed an appointment to have the tube removed and never rescheduled. The parents also weren't taking their daughter to a

---

[1] To preserve their privacy, we refer to the children as "son" and "daughter."

specialist to have the G-Tube cleaned and assessed frequently enough. According to the therapist, when a child has a G-Tube, she needs to be under close observation on a regular basis. The therapist was concerned that the area around the tube could become infected if the parents weren't properly cleaning and maintaining the tube.

The parents also never followed through with appointments at a high-risk developmental clinic, a regional center, and another clinic for developmental assessment, they missed an appointment with a neurologist, and they never scheduled an appointment with an orthopedic doctor. The parents didn't schedule appointments with a pediatric surgeon and another medical group because those specialists were listed on the second page of recommended providers and the parents only looked at the first page. The parents also hadn't taken their daughter to see her pediatrician since January.

Mother blamed the doctors' offices and the family's insurance provider for making it "hard" to schedule appointments. The occupational therapist reported, however, that mother had yet to designate a primary care doctor through the family's insurance provider, which was causing "authorization issues." And, according to a staff member at the pediatrician's office, the child's authorizations to see other specialists had expired because the parents hadn't taken their daughter to see the pediatrician recently. The parents needed to take the child to the pediatrician so that the doctor could re-issue the referrals as "urgent." The staff member offered to schedule appointments for the daughter, but mother declined, claiming she would do it herself. The staff member never heard back from mother.

Mother claimed it was difficult to schedule and attend appointments for her daughter because the family was going through hard times. Father had recently lost his job, so mother had to work part time. The family only had one car, which made it difficult for the parents to get to work and take their daughter to her appointments. And, although the child's orthopedic therapist wanted to conduct remote sessions with the parents because of COVID-19 restrictions, the parents' computer didn't work at the time.

A public health nurse interviewed mother and father. Mother and father did foot exercises with their daughter every day, and mother cleaned the G-Tube at every changing. The nurse observed, however, that mother had difficulty finding supplies to clean the tube and that she had to dig in her closet to find one tube of cream and one swab. According to father, they ran out of food supplies for their daughter's G-Tube and were unable to reach a doctor, so they tried feeding her with a bottle, which worked.

The nurse also noticed the area around the daughter's G-Tube looked infected and urged the parents to have it checked out. The parents told the nurse that about two months earlier, the area around the tube had blistered and oozed puss, but father claimed the emergency room doctor told him that was "normal."

In mid-May 2020, after the Department of Children and Family Services (Department) contacted the family, mother took her daughter to the pediatrician, who issued new authorizations for the child to see specialists. After seeing the pediatrician, mother scheduled an appointment with a gastroenterologist, and she was waiting for authorizations for an appointment with a neurologist. The daughter's authorizations to see the

occupational therapist had expired, however, because mother still had yet to designate a primary care doctor for her daughter.

In early June 2020, mother took her daughter to an appointment with a pediatric gastroenterologist. The doctor removed the child's G-Tube and, according to mother, the child was doing "really great."

In mid-June 2020, the Department filed a petition on behalf of the children. The petition alleged the parents medically neglected their daughter by missing, or failing to schedule, several medical appointments. The petition alleged the parents' neglect placed both children at risk of serious physical harm (Welf. & Inst. Code,[2] § 300, subds. (b) & (j); B-1 and J-1 allegations).

At the initial hearing on the petition, the court found father was the children's presumed parent. The court also found the petition alleged a prima facie case under section 300, subdivisions (b) and (j) and released the children to their parents' custody. The court ordered the daughter to be assessed by the public health nurse and the regional center, and it ordered the Department to provide the family with transportation assistance.

One of the Department's social workers visited the family's home in August 2020. The daughter appeared healthy and clean, and she was bonding with father. The home was clean and well-stocked, and the social worker didn't observe any dangerous conditions.

Mother denied neglecting her daughter and blamed the Department for making her and father look bad. She claimed it

---

[2] All undesignated statutory references are to the Welfare and Institutions Code.

was difficult being a parent of two, especially because she and her daughter were struggling with their own health issues. After giving birth to her daughter, mother had a hysterectomy and was on dialysis, and the family's car recently broke down.

Mother and father denied missing an appointment with a G-Tube specialist in January, claiming they were never told when their daughter needed to have the tube removed. Mother also blamed missing other appointments on miscommunications between her daughter's doctors and those in charge of issuing authorizations for the child to see specialists. According to father, when they tried to make appointments with specialists the phone numbers either didn't work or the parents were redirected to other offices. Although the Department offered to pay for the parents to use public transportation to take their daughter to her appointments, mother declined because the "buses are not clean for her children to ride on them."

Mother took her daughter to the primary care doctor in late August 2020. According to the doctor, the daughter's feet "no longer look like 'club feet.'" Mother still had yet to follow up with an orthopedic doctor, however. The primary care doctor told the Department that it took mother a while "to get on top" of scheduling appointments for her daughter, "at least until the Department became involved."

A social worker with the High Risk Infant Follow Up Clinic updated the Department on the parents' progress in maintaining appointments for their daughter. Before the Department became involved, the parents had missed about 42 percent of their child's appointments. In June 2020, the parents attended a remote high-risk appointment. They missed a neurology appointment in late June but rescheduled and attended the new appointment a

couple of weeks later. The parents also missed two appointments with an orthopedic doctor in August 2020, but they scheduled a new appointment for early September. The parents also scheduled an appointment with a gastroenterologist for a few days after the orthopedic appointment.

According to a representative from the South Central Los Angeles Regional Center, the daughter was eligible for services through the center. The parents opted not to participate, however. According to the representative, the program requires voluntary participation by a child's parents.

In October 2020, the court held the jurisdiction hearing. The court sustained the B-1 allegation as to the daughter, struck language from that allegation that the parents' conduct placed the son at risk of harm, and dismissed the J-1 allegation.

In sustaining the B-1 allegation, the court explained that the parents' failure to follow through on medical appointments could impede their daughter's ability to walk without difficulty for the rest of her life. Instead of declaring the daughter a dependent, the court ordered the parents to participate in informal services under the Department's supervision (§ 360, subd. (b)). Specifically, the court ordered the parents to comply with all medical appointments and recommendations for the daughter, follow through on a regional center referral, and attend developmentally appropriate parenting programs.

Father appeals.[3]

---

[3] The informal supervision order under section 360, subdivision (b) is appealable as a disposition order. (See *In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.)

# DISCUSSION

Father contends insufficient evidence supports the court's jurisdiction finding under section 300, subdivision (b). We disagree.

"Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent ... to adequately supervise or protect the child ... .' " (*In re E.E.* (2020) 49 Cal.App.5th 195, 205, italics removed.) Subdivision (b)(1) requires only that a parent has failed or is unable to adequately supervise or protect her child; it does not require negligent or culpable conduct by the parent. (*In re R.T.* (2017) 3 Cal.5th 622, 629 (*R.T.*).)

"The juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence that the child is at risk of future harm from the parent's negligent conduct. [Citation.]" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 (*Yolanda L.*).) The court may consider past events as an indicator of whether the child faces a current risk of harm because "[a] parent's past conduct is a good predictor of future behavior." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) A parent's denial of wrongdoing or failure to recognize the negative impact of her conduct is also relevant to determining risk under section 300. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293 (*A.F.*).) To show the child faces a risk of harm at the time of the jurisdiction hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 136.)

We review a juvenile court's jurisdiction finding for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We will affirm the finding if it is supported by evidence that is reasonable, credible, and of solid value. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) " '[W]e look to see if substantial evidence, contradicted or uncontradicted, supports [the court's findings]. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citations.]" (*R.T.*, *supra*, 3 Cal.5th at p. 633.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re R.V.*, at p. 843.)

Substantial evidence supports the court's finding that the parents' failure to schedule and take their daughter to numerous appointments with specialists placed the child at risk of serious harm. The parents were aware that their daughter had significant medical and developmental issues when she was discharged from the NICU. The occupational therapist stressed to the parents that their daughter was considered a "high-risk infant" and that they needed to continue taking her to see specialists after leaving the hospital. To that end, the parents were provided a list of referrals for numerous specialists that needed to treat and monitor their daughter, including the gastroenterologist who installed her G-Tube and an orthopedic therapist.

The parents failed to follow through on most of the referrals. Between January and May 2020, they took their

daughter to only one appointment with her pediatrician. They didn't take her to the gastroenterologist to have the G-Tube removed until June, even though she hadn't needed the device since January. They never took her to an orthopedic doctor, even though they were advised to do so and were aware that she was diagnosed with clubfeet. As mother acknowledged, the parents failed to schedule appointments with several other specialists because they neglected to thoroughly read the list of referrals they were provided when their daughter was discharged from the hospital.

It was not until the Department contacted the family in May 2020, about half a year after their daughter was discharged, that the parents began showing any initiative to take her to see the recommended specialists. Fortunately, it appears the child has yet to suffer any serious harm as a result of the parents' neglect. But that doesn't negate the long-term health and developmental risks the parents created for their daughter by failing to ensure she received regular monitoring and treatment through the recommended specialists. (See *Yolanda L.*, *supra*, 7 Cal.App.5th at p. 993 [juvenile court doesn't need to wait until a child suffers actual harm before assuming jurisdiction].)

While the parents began taking their daughter to more appointments after the Department intervened, they continued to lag. For example, the parents missed and had to reschedule appointments with their daughter's neurologist and orthopedic doctor in June and August 2020. And despite the court ordering the daughter to be assessed by the regional center, the parents opted not to participate in any services, even though the agency determined the child was eligible to receive them.

Most importantly, the parents refused to accept any responsibility for neglecting to follow through on scheduling appointments with, and taking their daughter to see, the recommended specialists after she was released from the NICU, blaming the Department, the doctors' offices, and the family's insurance provider for the delay. (*A.F.*, *supra*, 3 Cal.App.5th at p. 293 [parent's failure to acknowledge impact of her neglectful conduct supports finding that her child continues to face risk of harm].) But, as the daughter's occupational therapist reported, much of the delay in obtaining authorizations for the child to meet with specialists was caused by the parents' neglect. For instance, the parents failed to designate a primary care physician for the child, which they needed to do before their insurance provider could authorize their daughter to see many of the specialists. The parents failed to regularly take their daughter to see her pediatrician, causing that doctor's authorizations to see other specialists to expire. And, as we just noted, the parents failed to read the entire list of recommended specialists, not noticing that there were several specialists listed on a second page that they never saw until the public health nurse brought it to their attention. While we are sympathetic to the difficult circumstances the parents have endured since their daughter was born, those difficulties do not override the importance of ensuring their child receives the treatment and services necessary to her healthy development.

In short, it was reasonable for the court to find that, at the time of the jurisdiction hearing, there continued to be a risk that the parents would not ensure their daughter received the treatment she needed without the Department's supervision and assistance.

## DISPOSITION

The juvenile court's informal supervision order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, Acting P. J.

WE CONCUR:



EGERTON, J.



ADAMS, J.*

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.