Filed 11/10/21  In re S.P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re S.P., a Person Coming Under the Juvenile Court Law. | D079365 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. NJ15676 ) |
| Plaintiff and Respondent, | |
| v. | |
| G.P., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael Imhoff, Judge.  Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

G.P. (Father) appeals dispositional orders entered in juvenile dependency proceedings declaring his son, S.P., a dependent pursuant to Welfare and Institutions Code[1] section 361, subdivision (d) and ordering family maintenance services. The San Diego County Health and Human Services Agency (the Agency) initiated the proceedings when S.P. was three weeks old, based upon M.P. (Mother)[2] and Father's failure to provide adequate nutrition to S.P.'s older sibling, T.P.

On appeal, Father argues the juvenile court abused its discretion by denying his request for voluntary services pursuant to section 360, subdivision (b). We reject Father's claims and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Dependency Proceedings Involving S.P.'s Older Sibling, T.P.*

The Agency removed T.P. from the parents' care in October 2020 after the child was diagnosed with nonorganic failure to thrive and required a 15-day hospitalization. T.P. was 21 months old at the time and was unable to sit by herself, hold anything in her hands, walk, or crawl. Despite having normal growth for the first two months of her life, T.P. had essentially no weight gain between six and 21 months.

Medical professionals coached the parents on proper nutrition and feeding guidelines during T.P.'s hospitalization, but the parents were observed physically and verbally restricting T.P.'s food. Father referred to T.P.'s hunger cues as "irresponsible eating" and "binging behavior," while Mother described normal feeding of T.P. as "force feeding" and high calorie food recommendations "unhealthy." Once medical staff took over T.P.'s

---

[1]     Further statutory references are to the Welfare and Institutions Code.

[2]     Mother is not a party to this appeal.

2

feedings, the child gained weight, demonstrated appropriate feeding cues, and ate a wide variety of food that the parents were not offering her because they claimed she was allergic. A multidisciplinary team concluded that underlying mental health issues were contributing to the parents' inability to feed T.P. appropriately.

At T.P.'s six-month review hearing on May 20, 2021, reunification services were extended for an additional six months. In the Agency's view, the parents had failed to address their respective underlying mental health problems and lacked insight into the seriousness the nutritional neglect had on T.P.'s health. Mother had been diagnosed with R/O Factitious Disorder Imposed on Another (by Proxy), R/O Anorexia Nervosa, and Obsessive-Compulsive Personality Disorder and it was recommended that she receive therapeutic services and monitoring. However, she had yet to begin therapeutic services and had not received a formal eating disorder assessment. Father was also diagnosed with R/O Dependent Personality Disorder, and the Agency recommended he receive therapeutic services as well as complete nutritional counseling to reinforce T.P.'s nutritional needs.

At the time of the six-month review hearing, both parents continued to claim T.P. suffered from a genetic disorder, and on the advice of their attorneys in related criminal matters[3], refused to acknowledge their role in T.P.'s malnourishment. Yet once removed from the parents' care and placed with the paternal grandparents, T.P. had demonstrated improvement in both physical therapy and occupational therapy, continued to gain weight, was able to walk independently, ate regularly, and had new hair growth. T.P.'s 12-month review hearing was set for November 18, 2021.

---

[3]     Both parents were charged with child abuse (Pen. Code, § 273a) based upon T.P.'s malnourishment, and those charges remain pending.

2.      *S.P.'s Dependency Proceedings*[4]

S.P. was born in May 2021.  Mother hid the pregnancy from the Agency until April 2021.  Then despite advising the parents to contact the Agency once the child was born, the Agency only found out about the birth through second-hand information.

On June 10, 2021, the Agency filed a petition pursuant to section 300, subdivision (j), alleging S.P. was at substantial risk of abuse or neglect as suffered by T.P.  According to the Agency's detention report, a child abuse pediatrician found "significant concerns for the health and well-being of [S.P.] if he were to remain in the care of parents who have demonstrated previous starvation of a child that began in infancy; who have not received the recommended mental health treatment regarding disordered food dynamics; and who have not been able to recognize their role in their child's severe malnutrition.  Caregivers who are unwilling/unable to acknowledge that their child has been the victim of abuse/neglect are unlikely to modify their behavior or to recognize future abusive events and respond to them appropriately."

The social worker assigned to the case also expressed concerns about the parents' ability to properly care for S.P. absent Agency intervention.  The parents had not yet taken responsibility for T.P.'s condition, instead blaming the paternal grandparents for T.P.'s dependency case because the paternal grandmother had raised concerns about T.P.'s condition to Kaiser.  Additionally, the parents' support system was reaffirming their belief that T.P.'s malnourishment was caused by a genetic condition, which had been ruled out.  The parents underlying mental health issues were also of concern

---

4       Pursuant to COVID-19 emergency measures, all proceedings in this matter were conducted remotely.

to the social worker, as Mother had yet to complete a formal assessment for an eating disorder, and Father was "passive when it comes to the mother."

At the detention hearing, the juvenile court detained S.P. in the care of his parents on the condition that they allow health care providers access to the child, engage in nutritional education, participate in the services ordered in T.P.'s case, and allow the Agency and S.P.'s counsel reasonable access to the child. Mother was to maintain a feeding journal that Father monitored. The court allowed the maternal grandmother to check on S.P. and authorized an eating disorder assessment for Mother.

On July 8, 2021, the social worker recommended S.P. be declared a dependent while remaining in the care of the parents with family maintenance services. Although the parents had followed the juvenile court's orders thus far, the social worker believed the parents had not yet shown they could provide S.P. with a safe, healthy, and stable environment without the Agency's involvement. The social worker noted that the parents had only shown progress after the Agency intervened, and they were continuing to deny responsibility for T.P.'s malnourishment. Given S.P.'s young age and the lasting consequences inadequate nutrition would have on his development, the Agency believed it was necessary to remain involved. In the addendum report, the Agency reiterated its recommendation that, despite the parents' progress in services and compliance with court orders, S.P. should be declared a dependent and family maintenance services should be ordered to ensure the child's safety.

The contested hearing was held on August 16, 2021. To support the petition, the Agency provided the court with the Agency's reports and attachments. The social worker assigned to T.P. and S.P.'s dependency cases also testified at the hearing, repeating her opinion that court-ordered

5

monitoring in S.P.'s case was necessary to ensure the child's safety. Although both parents had been compliant with the court's orders in S.P.'s case, they had made limited progress in the recommended services. The social worker indicated that Father's mental health issue was codependency, but he had not been referred to services to address that issue, and he had completed fewer than half of his child abuse classes. Father also continued to attribute T.P.'s condition to growth hormones and was not accepting responsibility for the child's neglect. As for Mother, she was in the early stages of treatment, and her therapist told the social worker that she was still not understanding her role in T.P.'s malnourishment. The social worker further noted that even though S.P. was currently doing well at two months old, T.P.'s condition did not begin to deteriorate until she was four months, and the social worker believed S.P. was "highly vulnerable" due to his young age and the severity of his sibling's neglect. Lastly, in response to questioning by the court and Father's counsel, the social worker clarified that a voluntary plan would last about six months.

At the conclusion of the Agency's presentation of evidence, the parents, through counsel, did not offer any affirmative evidence. Father's counsel contended during closing arguments that S.P.'s petition should be dismissed because there was no evidence that S.P. was at risk due to the same factors that led to T.P.'s dependency case. Counsel requested that even if the court made a true finding on the petition, the court should order the provision of a voluntary plan. Counsel noted that under a voluntary plan, a social worker would meet with the family twice a month and not just once a month, and the family would continue to receive the same services. Counsel emphasized that in the event the voluntary plan was unsuccessful, the Agency retained the option to renew its request for family maintenance.

After closing arguments, the juvenile court made true findings by clear and convincing evidence on the petition's allegations under section 300, subdivision (j), denied the request for a voluntary case plan, declared S.P. a dependent, and placed him with the parents under a family maintenance plan. In rejecting the voluntary case plan, the court cited section 360 and concluded that a voluntary plan was not in S.P.'s best interests, since the parents' failure to take responsibility for T.P.'s malnourishment indicated that they did not fully understand the risk that S.P. would suffer similar harm. The court set a 6-month review hearing for February 14, 2022, and set an interim review hearing for November 18, 2021.[5]

## DISCUSSION

Father's sole contention in this appeal is that the juvenile court abused its discretion by refusing his request for a voluntary case plan. He asserts that a voluntary plan of informal supervision was more beneficial to S.P. than a declaration of dependency and presented no risk to the child's well-being. He further contends that the court's rejection of informal supervision was based upon a misunderstanding of the relevant statutory authority.

1.      *General Legal Principles and Standard of Review*

After the juvenile court finds jurisdiction under section 300, it must determine the appropriate disposition for the child. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169 (*N.M.*).) The court has broad discretion in selecting the disposition that serves the child's best interests. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.) "Under section 360, subdivision (b), if appropriate, the court may, without adjudicating the child

---

[5]      Because the juvenile court's written order identified November 18, 2021 as the date for S.P.'s interim review hearing, and November 18 coincides with the date for T.P.'s 12-month review hearing, it appears the court misstated in its oral ruling that S.P.'s interim review hearing was set for November 16.

7

a dependent, order that services be provided to keep the family together under the informal supervision of [the Agency]." (*N.M.*, at p. 171 [citing §§ 301, 360, subd. (b); Cal. Rules of Court, rule 5.695(a)(2)].) Once informal supervision is ordered pursuant to section 360, subdivision (b), the court relinquishes its authority to oversee the services or the family unless the matter is brought back before the court pursuant to section 360, subdivision (c). (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1259 (*Adam D.*).)

Whether to exercise the option for informal services is left to the sound discretion of the juvenile court. (*N.M.*, *supra*, 197 Cal.App.4th at p. 171.) Such a discretionary determination "should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. [Citations.]" ' " (*Id*. at pp. 318-319.)

2. *The Juvenile Court Did Not Abuse its Discretion in Denying Father's Request for Voluntary Services*

Father has not shown an abuse of the juvenile court's discretion. Although the parents were complying with the court's orders and S.P. was physically healthy at the time of the contested adjudication, undisputed evidence in the record demonstrated that S.P. could be vulnerable to harm absent oversight from the Agency. Prior to the Agency initiating S.P.'s dependency proceedings, the parents hid Mother's pregnancy with S.P. from the Agency, and then failed to inform the Agency of S.P.'s birth. Additionally, S.P. had not yet aged into the window when his sibling began showing signs

8

of neglect, as T.P.'s health did not begin to deteriorate until four months old, and S.P. was still only two months old.

The evidence also supports the juvenile court's finding that the parents had failed to demonstrate insight and accept responsibility for the circumstances that led to T.P.'s malnourishment. From the beginning of T.P.'s dependency case in October 2020 and continuing through S.P.'s contested adjudication in May 2021, both parents consistently denied their conduct had contributed to T.P.'s malnourishment. Father specifically blamed growth hormones for T.P.'s emaciation, even though there was no evidence that such condition existed. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"].)

Father contends that a voluntary services plan should have been offered, because it would have increased the checks by the social worker from once to twice a month. He also notes that an informal supervision plan would have simply duplicated the services already in place for T.P.'s proceedings. Although Father suggests that these factors weigh in favor of an order for informal supervision, this court is not at liberty to reweigh the evidence. (*People v. Overstock.Com, Inc.* (2017) 12 Cal.App.5th 1064, 1088 [under the abuse of discretion standard, the appellate court may not " ' "reweigh the evidence or substitute our notions of fairness for the trial court's." ' "].) In this case, despite the severity of the malnourishment suffered by S.P.'s sibling, the juvenile court maintained S.P. under the care of his parents but determined that it was not appropriate to order the provision of voluntary services. Given S.P.'s status as an infant and complete reliance on his parents for nourishment, the lasting consequences improper nutrition would have on his development, and the parents' lack of insight into T.P.'s

9

nutritional neglect, the court was well within its discretion to deny Father the option of informal supervision.

Father relies on *Adam D.* and *N.M.* to support his argument that the juvenile court abused its discretion by denying his request for voluntary services. His reliance on these cases is misplaced. In *Adam D.*, the appellate court affirmed the juvenile court's order for informal supervision under section 360, subdivision (b). (*Adam D.*, *supra*, 183 Cal.App.4th at p. 1262.) Thus, *Adam D.* involved the juvenile court's *approval* of informal supervision, and did not address the challenge Father raises in this appeal to a *denial* of informal supervision. Father's reliance on *N.M.* is also unpersuasive. There, a panel from this court determined that, although the father "was largely cooperative and had started services before the joint jurisdictional and dispositional hearing," the juvenile court was within its discretion to deny informal supervision to ensure the children's physical and emotional well-being. (*N.M.*, *supra*, 197 Cal.App.4th at p. 171.) Similarly, in this case, the record amply supported the juvenile court's denial of voluntary services, and such a determination "is a discretionary call for the juvenile court to make; it may opt to [offer voluntary services], but it need not." (*Ibid.*)

We reject Father's remaining contention that the juvenile court misapplied the law in declining to order informal supervision. The court referred to the relevant statutory provisions in its oral and written decisions, and the court's focus on the parents' lack of insight and acceptance of responsibility for T.P.'s malnourishment was appropriately aimed at evaluating whether S.P. remained at risk and whether the option of informal services was in the child's best interests. Contrary to Father's assertion, the social worker correctly represented to the court that a voluntary services plan

10

would last six months (§16507.3(a)),[6] and that absent court-ordered supervision, nothing would compel the parents to cooperate with the Agency in S.P.'s case. Thus, there is no indication in the record that the court misconstrued the law when it addressed Father's request for voluntary services.

A child's best interests is the paramount concern at the dispositional stage. (*In re Carl H.* (2017) 7 Cal.App.5th 1019, 1037.) In this case, the juvenile court acted well within its discretion when it determined that formal oversight through a family maintenance plan was necessary to protect S.P.'s best interests.

---

[6] To the extent Father argues an extension of a voluntary case plan beyond six months is authorized by section 16507.3, subdivision (a), such an extension is only available for families who have a parent in residential substance abuse treatment or a child who requires treatment in a residential treatment facility. Those circumstances are not applicable to these proceedings.

## DISPOSITION

The orders are affirmed.

McCONNELL, P. J.

WE CONCUR:


IRION, J.


DO, J.