Filed 11/29/21 Certified for Publication 12/21/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re EMILY L., a Person Coming Under the Juvenile Court Law. | B309567 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. HELEN F., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP07079A) |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Juvenile Court Referee. Reversed and remanded with directions.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephanie Jo Reagan, Principal Deputy County Counsel for Plaintiff and Respondent.

_____

The Department of Children and Family Services (DCFS) alleged, and the juvenile court found true, three allegations that Helen F. (Mother) had physically abused, failed to protect, and medically neglected her daughter Emily L. within the meaning of Welfare and Institutions Code[1] section 300, subdivision (b). The court ordered Mother to participate in six months of services under the informal supervision of DCFS pursuant to section 360, subdivision (b). During the period of informal supervision, DCFS neither filed a petition on Emily's behalf nor brought the matter back to court for any reason. While this appeal was pending, Emily turned 18 and is no longer subject to the jurisdiction of the juvenile court.

Mother appeals from the jurisdictional and dispositional order, challenging the sufficiency of the evidence to support the juvenile court's jurisdictional findings. DCFS requests that the appeal be dismissed as moot. Mother opposes dismissal. We conclude that although the appeal is moot as to Emily, we will exercise our discretion to address the merits. We reverse the order of the juvenile court asserting jurisdiction, vacate the court's factual findings, and direct the juvenile court upon remand to dismiss the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Allegations of the Petition*

On October 31, 2019, DCFS filed a petition on behalf of 16-year-old Emily L. and 7-year-old Andrew F. Count a-1, entitled Serious Physical Harm, alleged that Mother Helen F "physically

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

abused the child Emily by grabbing the child's neck, choking the child, causing the child to cough, gag, and have difficulty breathing. The mother pushed the child and forcibly grabbed the child's wrists. The mother pulled the child's hair. The child sustained a bump to the child's forehead and a scratch to the child's neck. On a prior occasion, the mother slapped the child's face." The petition alleged Father failed to protect the child from Mother's physical abuse. This count further alleged Mother's physical abuse and Father's failure to protect placed Emily and Andrew at risk of serious physical harm, damage, and danger.

Count b-1, entitled Failure to Protect, repeated the allegations of Count a-1 word for word. Paragraph b-2 added that both parents were "unable to provide [Emily] with appropriate parental care and supervision, due to the child's special and unique behavioral problems, including dangerous, aggressive and assaultive behavior. The child's special and unique behavioral problems and the mother and . . . father's inability to provide the child Emily with appropriate care and supervision endangers the child Emily's physical health and safety and places the child and the child's sibling Andrew, at risk of serious physical harm, damage and danger."

Paragraph b-3 alleged both parents "medically neglected the child Emily, in that the mother and the . . . father knew of the child's marijuana abuse, and the mother and father failed to obtain services to address the child's substance abuse. Such medical neglect of the child Emily by the mother and the . . . father, endangers the child's physical health and safety, creates a detrimental home environment and places the child and the child's sibling Andrew, at risk of serious physical harm, damage, danger and medical neglect."

3

Finally Count j-1, j-2, and j-3, entitled Abuse of Sibling, alleged that Mother's physical abuse of Emily and both parents' medical neglect of and failure to protect and supervise Emily placed Andrew at risk of serious physical harm, danger, damage, and medical neglect as well.

B.    *The Initial Investigation*

This family came to the attention of DCFS on October 15, 2019, the day after Mother called 911 asking for police assistance after she and Emily got into a physical altercation.  When interviewed later, Mother stated she had found and destroyed Polaroid photos of Emily which Mother deemed inappropriate; Emily responded by telling Mother she wanted to live with Father.  The argument escalated into a physical altercation.  Emily said Mother pulled on her earring; the child's left ear lobe was red with a small amount of blood and her forehead was red as well.  Emily also complained of pain to her right forehead.  Mother had a 2-inch bruise on her right bicep and a one-quarter inch laceration to her left thumb.  Emily was briefly detained and then released to her home, where the maternal grandmother also lived.

The initial DCFS investigation included interviews with Mother, Father, Emily, Emily's siblings Stephanie[2] and Andrew, the maternal grandmother, and Emily's school counselor.  On October 16, 2019, a DCFS social worker made an unannounced visit to Emily's school where, to no avail, she waited 25 minutes for Emily to arrive.  Emily's counselor said Emily had a history of

---

[2]    Stephanie lives in the home with Mother, Emily, and Andrew.  She is an adult and was not subject to dependency proceedings.

4

skipping class and was not doing well academically. She said the parents were involved and were trying to work with Emily to better her grades. The parents had taken away Emily's cell phone. According to the counselor, Emily was behind in school credits, defied the dress code by wearing shirts with her breasts "spilling out," and did not want a relationship with her father. The counselor reported she believed Emily was upset about her parents' separation. The situation had not improved and was worsening. Emily displayed "an attitude" towards school staff and her parents. The counselor noted she had not seen Emily with any marks or bruises and had no child safety concerns.

Two days later, the social worker made an unannounced visit to the school to interview Emily, who reported that she and her mother get into "really bad arguments" because Mother gets upset when Emily hangs out after school with friends and comes home late around 9:00 p.m. When Emily is out late, Mother calls her and Emily does not answer the phone, which further upsets Mother.

Emily confirmed that she and Mother had a recent physical altercation. It started when Emily came home and discovered Mother had ripped up some of her Polaroid photographs because she found them inappropriate. Emily believed Mother was upset because the photos showed Emily in a bikini. They began to argue and curse at each other, and then Emily pushed Mother and Mother pushed Emily back. Emily then pushed Mother down to the floor where they were both pulling each other's hair. Emily remembered punching Mother and being choked at a certain point by Mother. Mother removed her hands from Emily's throat when Emily began to gag and cough. Emily felt

like she was running out of breath; Mother called law enforcement because of what happened.

Emily reported that when she gets angry, she cannot control herself. When the police arrived, they cuffed her, patted her down, and gave her "life lessons." The police gave Emily a choice of staying at home or being arrested. She chose home. Later, Mother gave Emily three options: she could live with her father, stay at home with her, or go find somewhere else to live. Emily chose again to remain at home, but Mother took away her house key because she was still coming home late. Mother later returned the key because the maternal grandmother was going to be away in the afternoon and would be unable to let Emily into the house. Emily stated she did not want to live with her father because she wanted to continue to attend her current high school and she knew her father, who lived some distance away, did not want to wake up earlier than usual to attend to her.

Emily reported that both parents have addressed her low grades and tried to help her catch up with her credits. Her counselor recommended she attend continuation school, which she did not want to attend. She communicated better with her father. She believed she was too far behind in credits to catch up and that it would take too much work on her part to even try to catch up. She acknowledged hanging out with "bad friends" who were not a good influence on her, with her best friend being the "main bad influence." She smoked marijuana with these "bad friends." Her parents had discovered she smoked marijuana and Mother began to search her backpack and look through her things, which Emily did not like. She stopped smoking marijuana when her best friend left the school two weeks ago. She credited her boyfriend with being a good influence. Emily

6

told the social worker she would like to do better in school but knew she had made "wrong choices."

Emily acknowledged that her parents split up when she was seven years old, but it still affected her. She missed the "good memories" of when they all used to live together. She saw her father three days a week and felt bad for Mother because she is a single mother with three children. Emily reported her younger brother Andrew was homeschooled because he had been diagnosed with kidney cancer and was undergoing strong chemotherapy treatment. The maternal grandmother stays with him during the day while Mother works. When asked if the situation with Andrew had affected her life, Emily teared up and said it was difficult to see Andrew in that situation. She did not respond when asked if Andrew's illness was the reason for her current behavior. The social worker asked Emily if she would like to try some therapy to talk about the situation, and Emily said yes.

On October 21, 2019, now one week after the physical altercation between Mother and Emily, the social worker visited Mother at home. Mother said Emily's behavior was "uncontrollable." Emily has a "strong character" and does not want to follow any of the house rules or hear any type of redirection or advice from her parents. She came home from school around 8:00 or 9:00 p.m. When Mother would call to find out where she was, Emily did not answer the phone calls or turned off her phone, which worried Mother. Emily was currently failing her classes. Both parents were trying to motivate and help Emily with school. Both parents had tried to discipline her by taking way her phone and WiFi privileges. Mother suggested they do things together in an effort to build a

better bond, but Emily refused.  Emily appeared to Mother to prefer spending time with her friends than with her family.

Mother described the start of the altercation.  She found photos of Emily posed in a bikini lying down on a bed.  She believed Emily's boyfriend took the photos.  Mother ripped them up so they could not be used to bully Emily.  When Mother told Emily she had destroyed the photos, Emily began throwing things around the bedroom they were in.  She then began to advance toward Mother.  Laughing, Emily started to rip up photos of her younger self.  These included photos of Emily with her best friend, which Mother knew had sentimental value to Emily because her best friend had just moved away.  Emily tried to hit Mother, who grabbed Emily's wrist to keep from being hit.  Emily grabbed the bunk bed ladder and began to push it in Mother's direction.  Mother had never seen Emily like this and was scared by her behavior.  Emily pushed Mother, Mother pushed back, and Emily punched her.  Mother tried to hold Emily's wrists to stop the punching.  Emily kicked Mother in the stomach and they grabbed each other's hair.  They fell to the floor; Emily climbed on top of Mother and began to hit her with a closed fist.  Mother still had Emily by the hair.  They stopped fighting and Emily went into the living room where she began kicking a glass table.  She overturned the living room loveseat.

Mother decided to call 911 because she did not know what else to do.  Emily moved to the kitchen and began kicking the refrigerator and opening cabinets, throwing everything to the floor.  Emily then charged Mother and began kicking her torso.  At that point, they grabbed each other by the hair and fell to the floor again.  Emily again began punching Mother with a closed fist.  Mother flipped over and choked Emily with one hand to get

her to stop. Emily began to cough and Mother let go and was able to get up off the floor. The police arrived and ultimately let Emily stay in the home. No incident like that has happened since. Mother reported that during the altercation, Emily laughingly said she hoped social services would arrive and take her little brother away. This comment hurt Mother deeply.

Mother reported Emily had previously become aggressive. In the prior month, Emily charged Mother when Mother said she intended to take away her earphones because Emily had stolen money from Stephanie. Stephanie called 911 and by the time police arrived, Emily had calmed down. Mother had been able to keep Emily at a safe distance by extending her arm to keep her away. Mother wanted Stephanie to move Andrew out of the house so he would not witness Emily's behavior.

Two weeks earlier than the most recent incident, Emily told Mother she was "going to kill this bitch" when Mother woke her up for school. Mother slapped Emily in the mouth for her language and Emily charged at her, dropped her on the bed, and got on top of her. Mother raised her arms to protect herself. Andrew and Stephanie witnessed the incident. Stephanie removed Andrew from the room, returned, and she and maternal grandmother grabbed Emily by the arms and restrained her from hurting Mother.

Mother advised she believed Emily was still affected by her parents' separation, even though the parents have a good relationship with each other and Father sees Emily regularly. Recently, Father told Mother that Emily had charged at him. He was able to fend her off and control her. Emily had refused to visit her father since that day, although Mother encouraged Emily to visit him.

Mother reported that six months ago, in March 2019, Andrew was diagnosed with a cancerous tumor on his kidney. He underwent surgery and chemotherapy and has been homeschooled ever since. Emily has declined to speak with Mother about her feelings surrounding Andrew's illness and his frequent hospitalizations.

On the same day of Mother's interview, Andrew was interviewed. He corroborated that Mother and Emily got into verbal altercations. He reported Emily "gets super mad" at being disciplined and she does not go to school, stays out with her friends, and comes home late after dark. Once he saw Emily get on top of his mother, which scared him because he thought Emily was hurting his mother.

Maternal grandmother was next interviewed. She confirmed Emily and Mother argued because Emily does not like to follow rules or have anyone telling her what to do. She confirmed when Mother called Emily, Emily would not answer the phone. She reported there was a physical incident between Mother and Emily when Emily charged at Mother. Father was involved with Emily, but stopped giving her gifts when she began her rebellious behavior. He cut off the internet and both parents have taken her phone away. Grandmother said Emily is violent towards both parents and has no respect for them.

Stephanie confirmed that Emily and Mother had physical and verbal altercations and she and the maternal grandmother once had to grab Emily and pull her off Mother. Stephanie did not want her brother witnessing that kind of behavior. Stephanie also confirmed Emily had not seen their father since he took her phone away and she responded by throwing things around his house. Stephanie also confirmed Emily had stolen money from

her by using Stephanie's debit card without her permission. She was frustrated because she had to lock up her debit card to keep Emily from misusing it. She confirmed Emily had stolen from their mother as well. Stephanie had offered to "hang out" with Emily who declined, preferring to be with her own friends.

On October 22, 2019, the social worker interviewed Father who said Emily is violent towards both parents. He blamed her bad behavior on hanging out with the wrong crowd. He had tried to advise Emily to change her behavior but she did not listen to him. Father stopped giving Emily money when he learned she smoked marijuana; he did not want her buying drugs. After a physical incident with Mother about a month ago, Father told his daughter to respect Mother. Emily told him "You're always telling me the same shit." Father asked Emily to apologize to him for being disrespectful. She got upset and began talking back, so he took away her phone. She responded by grabbing his tablet and dropping it to the floor. He responded by throwing her phone at the wall. She began throwing things around his home. She charged at Father and began hitting him on the head with a cast that was on her arm at the time. He grabbed her by the wrists and told her to go home to her mother. Emily has not visited or spoken to him since.

After interviewing father, the social worker met with Mother, Father, and Emily together in the dining area of Mother's home. The social worker told Mother it was wrong to choke Emily and she would be submitting a request for a warrant which meant there was a possibility that the children would be removed from her custody. Mother began to cry and stated Andrew needed her help because he was just getting through his

11

cancer.  Both parents asked the social worker to speak with Emily.

The social worker met privately with Emily who asked when they would be removed.  Emily said she was concerned about Andrew because he would suffer without his mother's help.  The social worker advised Emily to try to seek common ground with Mother and recommended that Emily seek therapy.  Emily said she understood.  Two nights later, Emily did not return home and Mother called the social worker to ask what she should do.  The social worker advised Mother to check with the school and file a missing person's report with the police.

Emily returned home the following morning.  Both parents were worried about where she had been.  The social worker advised them to file a missing person's report if it happened again.

DCFS included all this information in its detention report and recommended that both children be detained because "mother and [Emily] have unresolved issues which endangers the physical and emotional wellbeing of the children such that the children are at risk of suffering emotional or physical harm." DCFS concluded Mother had an inability to control Emily's behavior in the home.

DCFS aptly summarized the situation:

"Mother and child Emily have a history of getting into three physical altercations in the past year in the presence of the child Andrew or while he has been in the home.  Most recently, on or about March 14, 2019, they were involved in a physical altercation that Emily initiated, but also included mother resorting to choking Emily.  Mother said she choked Emily with the intention of having Emily run out of breath to stop Emily

12

from grabbing and kicking mother. In the past, Emily also has stolen money from her adult sibling's debit card. Also, a month or so ago, when father attempted to speak with Emily about her disrespectful behavior and they argued, Emily charged at father and began hitting him on the head with a cast that was on her arm. Emily has been exhibiting increasingly volatile and aggressive behavior since about the eighth grade. She has been ditching class, not completing school work, and smoking marijuana. She stayed out late and sometimes does not return home until the next day. Mother and father have tried multiple interventions, including taking away her cell phone privileges and not purchasing unnecessary items for her, but she has continued to exhibit the same if not increasingly more serious behavior."

C.    *Detention Hearing and Subsequent Events*
The physical altercation between Emily and Mother occurred on October 14, 2019. On October 28, 2019, DCFS obtained orders to remove Emily and Andrew from the home. Emily was placed with Father and Andrew remained at home with his maternal grandmother and older sibling Stephanie. Mother moved out. At the detention hearing on November 1, 2019, the court ordered Emily detained from Mother and released to the home of Father. Andrew was released to home of Mother on the condition that Mother reside with relatives.

For various reasons including the pandemic, the jurisdictional and disposition hearing did not occur until 13 months after the initial altercation. Before the hearing finally took place on December 1, 2020, several events occurred. The juvenile court ordered services for the parents and Emily. On December 19, 2019, Andrew underwent surgery to remove a

13

cancerous tumor from his testicle.  He entered a fourth round of chemotherapy and was scheduled for a bone marrow transplant at Children's Hospital.  The doctors advised Mother that Andrew's prognosis was poor.  Mother continued to work 35 hours a week to remain eligible for health insurance for the family.  She worked six days a week and then spent the nights with Andrew at the hospital.  She did not enroll in services for herself because she was going to and from work, the hospital, and Andrew's medical appointments.

At an interim hearing on December 27, 2019, the court ordered unmonitored visitation between Emily and Mother at the hospital only, as Andrew had been admitted for treatment.  On December 29, 2019, Father filed a missing person's report because Emily had not returned home the previous night.  He reported Emily continued to leave home without permission and skip school.  Emily was transferred to a continuation school where, as of January 31, 2020, she had 50 out of 210 credits needed for graduation.  Her GPA was 1.0.  Emily was visiting her mother, grandmother, and siblings at Mother's home with an adult family member always present.

By March 2020, wraparound services for Emily had still not been initiated.  Andrew's condition had worsened.  On March 3, 2020, the court referred the family for wraparound services.  The court also permitted unmonitored visits between Mother and Emily and one overnight visit per week.  The court gave DCFS discretion to permit Emily to move back home with her mother.  The parties advised the court that they were exploring informal supervision.  Mother was still going between work and hospital and Andrew's medical visits.  She was fully engaged in Andrew's treatment.  Father reported he was still having problems with

14

Emily, who continued to leave the house without permission and arrive two hours late for school. He restricted her cell phone use, including turning off her data services. Although Emily and Mother were authorized to have unmonitored overnight visits, none had occurred because Mother spent her nights at the hospital with Andrew. Father and Emily visited Mother and Andrew twice a week at the hospital and then at home.

In May 2020, Emily started receiving virtual wraparound services.

On June 19, 2020, Andrew died.

After Andrew's death, DCFS allowed Emily to go on an extended visit with her mother, which lasted until September 7, 2020. Mother started grief counseling and tried to get Emily into grief counseling as well. However, Emily was subject to a three-month wait after the death of her brother before she was eligible for counseling.

In September 2020, DCFS noted that Emily and Mother were not making themselves available for services. However, Emily's behavior had markedly improved – so much so that she was no longer eligible for wraparound services. Nor was she eligible for individual counseling services because she had private insurance through her parents. Emily returned to her father's home on September 10, 2020. Her father reported she was doing well at home and during her visits with Mother. Father was frustrated that Emily was no longer eligible for wraparound services.

As of October 2020, almost a year after the initial altercation, Emily had garnered 132.5 credits of the 210 needed for graduation. According to DCFS, about this time both Mother and Father became "unavailable" in that they stopped returning

DCFS's calls and, when contacted, they each questioned the ongoing need for DCFS involvement. At an unannounced home visit in October, Father reported to the social worker that Emily's behavior had changed "drastically" in that she was logging into virtual school sessions regularly, turning in assignments, and respecting his house rules. She wanted to learn to drive and to start working. In November 2020, she was scheduled to begin private counseling, which Father had arranged with Kaiser.

In November 2020 DCFS advised the court that Mother and Father were uncooperative, resulting in DCFS's inability to assess Mother's emotional state following the death of her son and her commitment to address the concerns that brought the family to its attention. DCFS recommended that the court declare Emily a dependent of the court and order services for Mother and Father.

D.    *Jurisdiction and Disposition*

On December 1, 2020, the court held the jurisdictional and disposition hearing. Mother, Father and Emily asked the court to dismiss the petition because circumstances with the family had markedly improved. DCFS opposed dismissal because Mother and Father had not been cooperative in the last few months, preventing DCFS from assessing whether Mother had learned anything that would prevent the physical violence from happening again. According to the minute order after the hearing, the court interlineated the petition, dismissing Father from the petition The minute order states that the court then sustained all remaining allegations against Mother as to Emily.

However, according to the reporter's transcript of the hearing, the court did not sustain all allegations. It stated: "I am going to sustain b1, but I am striking the Father from the

16

allegations. B2, I am going to strike Father from the petition. And b3, and I am going to strike Father from the petition." When counsel asked if the court was sustaining b3, the court reiterated: "Yes. I am sustaining b1, b2 and I am striking Father from the petition. And I am going to order [section] 360b in this case. The only reason I am not dismissing it is because of the Mother's lack of cooperation with the Department and I want to, even though the child turns 18 in four months, I think it is important for the Mother to avail herself of any of the services she can and beyond that she didn't demonstrate to the court while she had the opportunity. [¶] Parenting classes for the Mother are going to be ordered pursuant to [section] 360b, individual counseling, conjoint counseling with minor. [¶] And then for the child, Wrap T.B.S., F.S.P., conjoint counseling with parents if recommended by therapist. And I hope she takes advantage and does participate in those services. [¶] With regard to Father, he has really done—I'm going to strike parenting from his program. I think that he has demonstrated that the child is safe in his home. And I will note the Department's objection and I will note all of counsels' objections that the petition wasn't dismissed." The court did not refer to Count a in any way.

Mother timely appealed.

## DISCUSSION

A. *Although the Minor Is No Longer Subject to Juvenile Court Jurisdiction, the Factual Findings Against Mother Are Such That Her Appeal Should Not Be Dismissed As Moot.*

When a minor turns 18, the minor is no longer subject to juvenile court jurisdiction, subject to some exceptions not applicable here. (§ 300; *In re David B.* (2017) 12 Cal.App.5th 633,

17

645; *In re Gloria J.* (1987) 188 Cal.App.3d 835, 838.)  Generally, termination of juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot.  (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.)  "However, dismissal for mootness in such circumstances is not automatic, but 'must be decided on a case-by-case basis.' "  (*Ibid*.)  "[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error."  (*In re N.S.* (2016) 245 Cal.App.4th 53, 60.)  Both parties agree that because Emily is no longer a minor and therefore is no longer subject to juvenile court jurisdiction, no order can be made that would affect or alter her custody or placement.  We agree.  This is especially so given that the juvenile court placed Emily under informal supervision pursuant to section 360, subdivision (b), which deprives the court of authority to take any further action unless the matter is brought back before the court pursuant to section 360, subdivision (c) via a new petition.  (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1259–1260; *In re David B.*, *supra*, 12 Cal.App.5th at p. 638 [no new jurisdictional findings can be made for a person who is not a minor and has not previously been declared a dependent of the juvenile court].)

Nevertheless, Mother asks this court to review the jurisdictional findings despite termination of jurisdiction because of potential adverse consequences that may arise from the dismissal of the appeal.  She argues the allegedly erroneous jurisdictional findings could subject her to inclusion in the Child Abuse Central Index (CACI), which she notes may be provided to "county licensing agencies and others conducting background investigations of people seeking employment or volunteer work,

18

and to out-of-state agencies investigating prospective foster or adoptive parents." Emily was subject to juvenile court supervision under section 300, subdivision (b)(1) (physical abuse, failure to protect, medical neglect) because it was alleged she and Mother got into a physical altercation during which Emily punched Mother, Mother choked Emily, and both sustained physical injuries as a result of their physical fight.

This constitutes more than general neglect for purposes of CACI. Penal Code section 11165.2, subdivision (b), defines general neglect as "the negligent failure of a person having the care or custody of a child to provide adequate food, clothing, shelter, medical care, or supervision where no physical injury to the child has occurred." Substantiated findings of general neglect are expressly *excluded* from those which must be reported for potential inclusion in CACI; only findings of "child abuse or severe neglect" are subject to the CACI reporting obligation. (Pen. Code, § 11169, subds. (a) & (c).) Child abuse and neglect include "physical injury or death inflicted by other than accidental means upon a child by another person" and "the willful harming or injuring of a child or the endangering of the person or health of a child." (Pen. Code, § 11165.6.) " 'Severe neglect' means the negligent failure of a person having the care or custody of a child to protect the child from severe malnutrition or medically diagnosed nonorganic failure to thrive. 'Severe neglect' also means those situations of neglect where any person having the care or custody of a child willfully causes or permits the person or health of the child to be placed in a situation such that his or her person or health is endangered . . . including the intentional failure to provide adequate food, clothing, shelter, or medical care." (Pen. Code, § 11165.2, subd. (a).)

19

Because the conduct alleged here reasonably falls within the definition of child abuse, Mother is at risk of inclusion in CACI. Accordingly, she has demonstrated prejudice sufficient to warrant a discretionary review of the jurisdictional findings. (See, e.g., *In re Drake M.* (2012) 211 Cal.App.4th 754, 763.)[3]

We also exercise our discretion to review the findings because this case presents the important issue of whether a juvenile court may, as happened here, take jurisdiction over a minor when insufficient evidence supports the jurisdictional order in order to provide a parent with services. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137.)

B.  *Substantial Evidence Does Not Support the Jurisdictional Finding of the Juvenile Court.*

While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the child to the defined risk of harm. Thus, previous acts of neglect, standing alone, do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565.) The purpose of a dependency proceeding is to protect the child, rather than prosecute or punish the parent. (*In re Alysha S.* (1996)

---

[3]     The California Supreme Court has granted review in a case as to (1) whether an appeal of a jurisdictional finding is moot when the parent asserts that he or she has been or will be stigmatized by the finding; and (2) whether an appeal of a juvenile court's jurisdictional finding is moot when the parent asserts that he or she may be barred from challenging placement in CACI as a result of the finding. (*In re D.P.* (Feb. 10, 2021, B301135) [nonpub. opn.], review granted May 26, 2021, S267429.)

51 Cal.App.4th 393, 397 [evidence of father inappropriately touching child one year earlier is insufficient to allege those acts may continue in the future and was therefore insufficient to interfere with the family].)

By the time of the hearing in Emily's case, familial circumstances had undergone epic changes. Simply put, Emily had turned her life around. As of December 1, 2020, there was no evidence Emily was still quick to anger, prone to violence, smoking marijuana, ditching school, staying out overnight without permission, or disrespecting her parents and their rules. Rather, Emily was attending school, getting good grades, making up her class credits, communicating with and respecting the home rules of her two parents, turning in homework assignments, and, importantly, not fighting verbally or physically with her family members, including her mother. Emily's sea change may have occurred because of her brother's tragic death, the absence of her "bad" best friend, the little therapy she managed to receive, or simply because she had matured. In any event, no further confrontations had occurred with Mother in over a year, including during the three-month period of her "extended" stay with Mother from June to September 2020.[4] In light of Emily's remarkable transformation, neither parent no longer needed to control her against her will. And there was

_____

[4] Interestingly, Emily had more confrontations with Father than with Mother during the intervening 13-month period between the filing and adjudication of the petition, including a physical confrontation where Emily threw items at Father and Father had to restrain her by grabbing her wrists. Yet, notwithstanding these events, the juvenile court struck Father from the petition and dismissed the petition as to him.

21

certainly no evidence that a violent altercation like the one Emily precipitated with Mother in October 2019 would occur again or, given the changed family circumstances and the family's apparent bonding after Andrew's death, that Mother herself would initiate a physical fight with Emily.

The juvenile court must have recognized yet glossed over the absence of risk of future harm because it described no specific factual findings as to Mother and justified the assumption of jurisdiction over Emily as its way to get Mother and Emily services the court thought might benefit them during the last four months of Emily's minority. Notably, the juvenile court did not instruct Emily or Mother as to what each needed to work on with these ordered services.

We find this case very similar to *In re Ma.V.* (2021) 64 Cal.App.5th 11, where the Court of Appeal reversed the juvenile court because its findings were based on "stale" acts of domestic violence and neglect which had occurred 10 months earlier and had not been repeated. There, as here, because of the pandemic, mother had an unusually long time before the jurisdiction hearing to resolve the key concerns from which jurisdiction arose. There, as here, the juvenile court justified its order by finding mother was uncooperative with children's services. The Court of Appeal noted it is to be expected that parents may not be happy to have governmental interference in their private lives. The inability of a parent to get along with a social worker is not evidence to support a removal order. "While a social worker or juvenile court may feel more comfortable and confident about a parent who is friendly and gets along with them, that is not what the law requires." (*Id.* at p. 25; see also *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 290.)

22

Given the lack of substantial evidence of any risk of future harm to Emily at the time of the jurisdictional hearing, we conclude the juvenile court erred in assuming jurisdiction over this action.

## DISPOSITION

The jurisdictional order of the juvenile court is reversed and its findings are vacated. The matter is remanded to the juvenile court with directions to dismiss the petition.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

GRIMES, Acting P. J.

OHTA, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/21/21

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re EMILY L., a Person Coming Under the Juvenile Court Law. | B309567 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> HELEN F., <br><br> Defendant and Appellant. | ORDER CERTIFYING OPINION FOR PUBLICATION <br><br> [NO CHANGE IN JUDGMENT]) |

THE COURT:

The opinion in the above-entitled matter filed on November 29, 2021, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____

GRIMES, Acting P. J.          STRATTON, J.          OHTA, J.*

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.